[Crim. No. 24026. Second Dist., Div. Four. Oct. 29, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
REA MARIE SIRIGNANO, Defendant and Appellant.

## Counsel

Barney Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Jack T. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JEFFERSON, J.**—Defendant Rea Marie Sirignano, 18 years of age, was charged with the murder of Roderick MacLeod, in violation of Penal Code section 187.[1] Following a jury trial, she was found guilty of murder in the first degree. Defendant's motions for a new trial and for sentencing pursuant to Penal Code section 1202b were denied, and she was thereafter sentenced to state prison for the term prescribed by law. She appeals the judgment.

[1]Defendant was originally jointly charged in this matter with a Harold Leroy Rakowiecki, but was tried separately.

As it is contended on appeal that the evidence was insufficient to sustain defendant's conviction of murder in the first degree, we will review the evidence pertaining to this sordid crime in some detail.

On the morning of August 8, 1972, a barber named Kassak discovered the body of the deceased MacLeod behind his shop, lying in a sunken abutment near a parking lot located next to the Deluxe Hotel in Long Beach. Examination of the body by investigating officers disclosed the absence of any wallet, cash or identification on the body. The victim's rear pocket was protruding from his pants, his jacket was on backwards and his body bound with red cloth strips. He had been beaten severely on the head.

Investigating officers followed a clear trail of blood and fibers from the red cloth across the parking lot, through an alley into the Deluxe Hotel, and finally to room 301 of that establishment. Inside room 301 Officer Bostard observed quantities of blood, broken glass from a mirror and a Coca Cola bottle, a razor blade and several hypodermic syringes. In addition, on the same day the police recovered a bloodstained pillow and pillowcase from a trash can in the alley near the hotel. Also, a maintenance man discovered a rope with red strips of cloth attached to it, on the steps of a building directly across the street from the hotel, and gave it to the police.

At trial criminalist Curtis of the Long Beach Police Department testified with regard to his scientific analysis and findings concerning the victim and various items discovered by the police in room 301 and near the scene of the crime. The victim, subsequently identified as a Scottish sailor from a vessel in the harbor, had type O blood. That type was present on the glass pieces, the rope, the pillowcase and pillow; also present on these items were red fibers similar to those taken from the cloth strips encircling the victim's body.

Curtis examined a pair of black boots belonging to defendant, which had been found by Officer Bostard in a trash can behind defendant's residence shortly after the killing. Type O blood was present on the boots, as well as red cloth fibers. Curtis further found, embedded in the blood and fibers on the boots, a human hair which he could identify as having come from the sideburn area of a human head; he further determined that the hair had been severed from the head by force.

Fingerprint expert Kergil testified that he had found prints of the defendant in the bathroom of room 301 of the Deluxe Hotel during the investigation there.

Deputy Medical Examiner Choi performed an autopsy on the victim on August 9, 1972. He testified that death was caused by severe traumatic injuries to the forehead and scalp, and that the wounds in either location were severe enough to cause death. There were seven lacerations of the scalp, probably made by an instrument with a jagged edge; they could have been made by a broken coke bottle. Choi further observed that the victim's throat was bruised, his artificial dental plate broken, and his lips torn in a fashion which suggested that he had been gagged. There were various minor injuries to his feet, hands and groin, and Choi found needle-marks on MacLeod's chest. There was no evidence of drug ingestion, but the victim had a blood alcohol content of 0.15. In Choi's opinion, the victim had died at approximately 3 or 4 a.m. on August 8, and the wounds which caused death had been inflicted upon him within an hour of the estimated time of death.

On the evening of August 7, 1972, defendant, an unemployed young girl, was residing with friends on Locust Avenue in Long Beach. Witness Grover Blair gave her a ride from that address to the Deluxe Hotel area where she attempted to locate a friend of hers. Defendant was known on the street in the hotel area as "Gypsy" or "Gypsy Kitten." On this evening she was without funds, but managed to borrow a small amount of money from a friend. At about 9 o'clock in the evening, she was overheard by witness Larry Williamson, Grover Blair's roommate, in Brad's Restaurant, a local gathering place, stating that she had a "trick" (in prostitute vernacular, a customer) on the line whom she intended to roll and kill because he had $2,000 in his possession.

Witness Johnny Lee Martin, the night clerk at the Deluxe Hotel, testified that he talked to defendant shortly after 11 p.m. in the hotel. She approached him at the desk and told him that Don Collette, who lived in room 301, had rented his room to her. Later, she again spoke to Martin and told him she had a "trick" who had $2,000. She next appeared in the hotel with a woman named Rita. Between the two women and supported by them was a man who appeared to Martin to be drunk. The two women assisted the man up the hotel stairs; one of them was carrying a large coke bottle. Later Martin saw the defendant and Rita come down the stairs, and overheard one of them say, "Did you get the money?" to which the other replied, "Yeah."

Martin was required, as part of his duties, to conduct a check of the rooms in the hotel in the early morning hours. While he was doing this, he approached room 301 and heard noises inside, including moaning sounds. He knocked on the door and was admitted to the room. There he saw Don

Collette, John Bergen (known on the street as "Big Savage," apparently in recognition of his propensity for violence), a girl named Debbie who lived with Collette, and the defendant. Also present was a man, lying on the floor face down on a pillowcase. Collette was sitting on his back, while Bergen crouched near his head. Martin observed defendant sticking hypodermic needles into the victim's legs. Martin left the room but did not call the police.

On his second trip to room 301, Martin entered and the victim yelled "Help." This attempt to obtain assistance angered Collette, who instructed "Big Savage" to break the victim's jaw. "Big Savage" responded by pounding the victim in the face. On this occasion, Martin observed defendant kicking the victim in the head with her boot. Martin again left, and did nothing.

Martin returned once more to room 301 and found the door open. He saw "Big Savage" in the hallway. Inside, the group had been joined by Harold Rakowiecki, known as "Little Savage." A person not involved in the affair had come into the room before Martin's arrival, and had stated that he thought the victim was dead. Martin suggested to the group that they remove the body from the hotel. When he returned to the desk, Collette spoke to him, threatening him in an effort to persuade Martin to provide Collette with an alibi. Martin overheard Collette making a telephone call to someone, attempting to locate a car.

Shortly before 3 a.m., witness Larry Williamson testified he received a call from Collette, asking if he would bring his car down to the hotel and assist in disposing of the body of a person who had overdosed on cocaine. Williamson and Blair decided to come to the hotel and see what was going on. When they arrived, Williamson observed what appeared to be a body in a bloodstained laundry bag outside the hotel; he declined to help dispose of it when Collette admitted that the victim had not overdosed but had been beaten to death. Williamson acted as a lookout for police officers while Collette and other persons dragged the body away from the hotel.

A few minutes later Williamson observed defendant and Rakowiecki crossing the street in front of the hotel, and watched them dispose of a rope and some other item. Defendant and Rakowiecki then got into the back seat of Williamson's car. Defendant was in what appeared to be an excited state. She talked freely about the killing, claiming to have stabbed the victim 47 times. She said that she had received only a few dollars from the robbery of the victim, and that she had been cheated out of her fair share by other persons upon whom she planned to take revenge. Defendant asked

Williamson, driving the car, to stop at a gas station so that she could wash the blood off her hands and arms. Blair, who was sitting in the front passenger seat, observed that defendant did have blood on her hands and arms. Williamson and Blair drove defendant home. Thereafter, Williamson contacted the police.

Defendant was arrested on August 8 and after being advised of her constitutional rights, discussed the events of the previous evening with Officer Bostard. She first told him that early in the evening on August 7, while she was at the Box Bar near the hotel, a barmaid there named Rita had told her that a pool hustler in the bar had learned that one of the customers was carrying a large amount of money, $2,000. Rita had suggested to defendant that she assist in luring the proposed victim outside the bar in order to rob him. "We'll get the money and split it three ways" said Rita to defendant. Defendant told Officer Bostard that she refused to participate, went on to other bars and then home late in the evening.

A different version slowly emerged from defendant's subsequent conversations with Bostard. According to his testimony, defendant admitted that she had had drinks with the sailor, MacLeod, on the evening of August 7; that the sailor had invited Rita and her to a party on board his ship that evening; that after the bars closed at 2 a.m., Rita and defendant had brought the sailor to room 301 so that defendant could change her clothes for the party. When they entered the hotel room, Collette had struck MacLeod down from behind. Rita had emptied the victim's pockets, and had departed from the room with defendant, giving her two dollars as her share of the proceeds of the robbery. Defendant had then gone to Brad's Restaurant for a cup of coffee. She returned to room 301, however, and discovered that MacLeod had been tied up with strips torn from a red dress; he was moaning and covered with blood. She saw Collette and "Big Savage" hitting the victim; "Big Savage" was also covered with blood, and instructed her to find him some clean clothes. After a trip around the hotel area, she located some clothing for him and returned with it to room 301. She then discovered MacLeod was dead; helped remove blood from the walls of the room; helped the others remove the body. Defendant denied striking the victim* with her boot, but told Bostard where the boots she had worn that evening could be found.

At trial, defendant testified in her own behalf, insisting that at no time had she intended to roll or kill the victim; Collette's attack upon him had not been prearranged insofar as she knew but was a surprise to her, and had frightened her. She could not explain why she had returned to the hotel room after her original departure, or assisted the others thereafter.

Defendant contends that the evidence was insufficient to permit application of the felony-murder rule, and that her conviction should be reversed.

Penal Code section 189 states, in pertinent part, that "All murder . . . committed in the perpetration of, or attempt to perpetrate, . . . robbery . . . is murder of the first degree." The objective of the Legislature in enacting this provision was to deter persons from killing during the commission of certain enumerated crimes, including robbery, by holding them strictly accountable for such killings "whether . . . wilful, deliberate and premeditated, or merely accidental or unintentional, and whether or not the killing is planned as a part of the commission [of the underlying offense]." (*People* v. *Stamp,* 2 Cal.App.3d 203, 209 [82 Cal.Rptr. 598]; *People* v. *Johnson,* 28 Cal.App.3d 653, 658 [104 Cal.Rptr. 807].)

It has long been held that the felony-murder rule may apply only where there is proof that defendant had formed the specific intent to commit the concomitant felony prior in time to the killing; that intent may be proved by circumstantial evidence. (*People* v. *Anderson,* 70 Cal.2d 15, 34 [73 Cal.Rptr. 550, 447 P.2d 942]; *People* v. *Tolbert,* 70 Cal.2d 790, 801 [76 Cal.Rptr. 445, 452 P.2d 661].)

In the instant case, there was ample evidence that defendant and others had formed a plan on the evening of August 7 to lure the victim MacLeod to room 301 of the Deluxe Hotel and rob him of what was believed to be a substantial sum of money. The first blow, which might have been a fatal one according to the medical testimony, was struck prior to the actual robbery. Long after it was apparent that no additional money would be forthcoming from the victim, the persons involved, including defendant, continued to assault him; when he was dead, the group took steps to avoid apprehension for the robbery and death. In our view, the evidence was more than ample, indeed overwhelming, in support not only of applicability of the felony-murder rule, but in support of conviction of first degree murder without reference to Penal Code section 189. Further, the evidence was such that the jury could convict defendant not only as an aider and abettor, and therefore a principal (Pen. Code, § 31) but as a principal participant.

It is true, as defendant contends, that the felony-murder rule has been held inapplicable to those situations where the concomitant felony has been completed prior to the killing. It has been held inapplicable when, after the completion of a robbery, the person or persons committing the robbery have possession of the plunder and have made their way to a place of temporary safety. (*People* v. *Boss,* 210 Cal. 245 [290 P. 881]; *People* v. *Salas,* 7 Cal. 3d 812 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].) Whether in

fact the underlying offense has been completed prior to the killing is a question of fact to be determined by the jury. (*People* v. *Salas,* cited *supra,* p. 824; *People* v. *Brunt,* 24 Cal.App.3d 945 [101 Cal.Rptr. 457]; *People* v. *Powell,* 40 Cal.App.3d 107, 163 [115 Cal.Rptr. 109].) Defendant contends that the evidence conclusively demonstrated that the robbery of MacLeod was completed prior to the killing, that defendant had received her share of the proceeds of the crime and had reached a place of temporary safety before MacLeod died; thus, the felony-murder rule did not apply.

The record supports the inference that the defendant and her associates had planned to kill the victim so that he would not be able to testify against them. There was substantial evidence to support the conclusion that the events of the evening formed one "continuous transaction," and such a finding clearly results in felony-murder, in the first degree. (*People* v. *Mitchell,* 61 Cal.2d 353, 362 [38 Cal.Rptr. 726, 392 P.2d 526].)

The jury was carefully and completely instructed that if they believed "that the robbery had been completed and terminated prior to the killing of Roderick MacLeod, then such robbery may not be used to find defendant guilty of murder in the first degree." They were also instructed that a "robbery is no longer being committed when the person or persons committing the robbery have possession of the plunder and have made their way to a place of temporary safety even if just momentarily. Failure to win one's way to a place of temporary safety means that said person is still fleeing or still trying to escape." We conclude that defendant received the benefit of every instruction to which she was entitled, based upon the evidence. Defendant's further contention, that the instructions were erroneous because the jury might have been misled as to the requirement that the events be part of a "continuous transaction," is without merit.

■ Finally, defendant contends that the trial court erred when it refused, at the time of sentencing, to consider the provisions of Penal Code section 1202b applicable to the case at bench.

Penal Code section 1202b provides: "In any criminal proceeding in which defendant is convicted of a felony or felonies and is committed to the custody of the Director of Corrections, if defendant was, at the time of commission of the offense or offenses, or of the apprehension from which the criminal proceeding resulted, under the age of 23 years, the court may, notwithstanding any other provision of law fixing or affecting the penalty for the offense or offenses, specify that the minimum term of imprisonment for the offense or the offenses cumulatively shall be six months. *This section does not apply to any offense punishable by death."* (Italics added.)

Defendant claims that since *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.

Rptr. 152, 493 P.2d 880], holding that no offense is punishable by death, was the prevailing law at the time of her arrest and conviction, her conviction of first degree murder could not have been punishable by death; thus the statute did have application to her sentencing, and should have been considered by the trial judge.

Her contention in this regard was foreseen by the Supreme Court in *People* v. *Chambers,* 7 Cal.3d 666, 674, footnote 9 [102 Cal.Rptr. 776, 498 P.2d 1024], wherein it was observed that "The issue of section 1202b being applicable to an offense which was, as enacted, punishable by death [but now is not, because of *People* v. *Anderson,* cited *supra*] is not now before us and is not herein decided."

We have been unable to find any decision dealing directly with the applicability of section 1202b to matters decided after *People* v. *Anderson,* cited *supra,* had removed the death penalty. In *People* v. *McCullin,* 19 Cal. App.3d 795 [97 Cal.Rptr. 107], it was held that where the possibility of the death penalty had been removed from the case by stipulation between the People and the defense, 1202b could have no application in the sentencing of the defendant because the offense could have been punishable by death, whether or not the death penalty was a possibility in the particular case at bench. In *McCullin,* at page 800, the court observed that the purpose of 1202b was to equalize the treatment afforded to persons committed to the Youth Authority with that afforded to persons of nearly the same youthful age committed to state prison, and noted that the purpose could not be served in *McCullin,* because persons committing first degree murder may not be committed to the Youth Authority (see *People* v. *Bell,* 17 Cal.App. 3d 949 [95 Cal.Rptr. 270]).

In the instant case, we have concluded that the legislative purpose of 1202b, that of " 'protect[ing] society more effectively by substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found guilty of public offenses' " (*In re Ward,* 227 Cal.App.2d 369, 375 [38 Cal.Rptr. 650]; *People* v. *Chambers,* cited *supra,* p. 674), would not be served by permitting application of 1202b, and that the legislative intent would be, in fact, avoided by such application.

The People point out that in *People* v. *Anderson,* cited *supra,* the California Supreme Court stated, at page 657, that "[t]he underlying gravity of those offenses (for which the death penalty had previously been imposed) endures and the determination of their gravity for the purpose of bail continues unaffected by this decision." The offense of which this defendant was

convicted was grave indeed, and under present law could conceivably have resulted in the death penalty. Placing the emphasis on the legislative intent with respect to grave crimes, we hereby decide that the trial court correctly determined that 1202b was not available to defendant in the instant case.

Judgment affirmed.

Files, P. J., and Cole, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 26, 1974.

---

*Assigned by the Chairman of the Judicial Council.