Russell Lee HINMAN,
Petitioner-Appellee,

v.

D. J. McCARTHY, Superintendent,
Respondent-Appellant.

No. 81–5051.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1981.

Decided Feb. 16, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc May 11, 1982.

Shunji Asari, Deputy Atty. Gen., Los Angeles, Cal., argued, for respondent-appellant; George Deukmejian, Atty. Gen., Owen Lee Kwong, Deputy Atty. Gen., Los Angeles, Cal., on brief.

Karen R. Smith, Deputy Federal Public Defender, Los Angeles, Cal., for petitioner-appellee.

Before WALLACE and TANG, Circuit Judges, and TURRENTINE,* District Judge.

WALLACE, Circuit Judge:

McCarthy (the State) appeals from an order of the district court granting a writ of habeas corpus to Hinman pursuant to 28 U.S.C. § 2254. The State makes three different challenges to the granting of this collateral relief. First, the State contends that 28 U.S.C. § 636(b)(1)(B), which authorizes federal magistrates to conduct evidentiary hearings in habeas proceedings and make recommendations to the district court, constitutes an unconstitutional delegation under Article III and violates principles of comity and federalism. Second, the State argues that Hinman should be denied federal habeas relief as he has been afforded a full and fair opportunity to litigate his federal claim in state court. Last, the State contends that the district court erred in concluding that the improper admission of a statement elicited from Hinman by the police in violation of his *Miranda* rights, was not harmless beyond a reasonable doubt. We affirm.

I

A jury found Hinman guilty of murder in the first degree and of assault with a deadly weapon, in connection with the stabbing death of Hopkins on the morning of June 19, 1975. The events occurring prior to the stabbing are significant. We review the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

Hinman, age 18, and three young friends, Gutierrez, Harger, and Kicklighter, were walking to a hospital, in order to obtain medical treatment for injuries they had suffered in an earlier traffic accident. On the

---

* Honorable Howard B. Turrentine, United States District Judge, Southern District of California, sitting by designation.

way, Gutierrez entered a parked automobile, apparently searching for something within the car, and then after exiting the vehicle, threw a brick through its window. The contents of the glove compartment were later found scattered on the floor of the automobile. After the car window was broken, the four youths ran to the hospital. They were denied treatment because they were under age and were returning when the stabbing occurred.

Green had observed Gutierrez throwing the brick through the window of the automobile from his apartment and decided to find a public telephone and to call the police. While riding his bicycle in search of a telephone, Green encountered the four young men and asked them about the breaking of the car window. Green testified that after he mentioned that someone was going to call the police, Hinman pushed Green off his bicycle and the two began to fight in the street. Then, according to Green, Hinman asked Green if he wanted to get stabbed, and Green ran.

When Green reached his apartment house he saw Hopkins standing at the doorway. Hinman and the other three boys caught up with Green, and Hinman was overheard making the statement "take it there." Green then entered the apartment house, whereupon he first realized that he had been stabbed. A few minutes later, Green went back outside and found Hopkins badly wounded, but was unaware of how the injury occurred.

Dooley, looking through her apartment window, saw the confrontation between Hopkins and the four young men. She saw Hopkins lying on the sidewalk fighting with one of them and heard one of the other young men say, "Turn him around. Come on. Turn him around. We will get him." She then observed one of them pick up an object that looked like a tent stake and turn toward Hopkins. At that point she backed away from the window.

At Hinman's trial, Kicklighter and Gutierrez each asserted his privilege against self-incrimination. A police officer was permitted to read to the jury statements he had obtained from them shortly after the incident in question. As to the stabbing of Hopkins, Kicklighter told the police that while Hinman was fighting with Hopkins, Gutierrez took Hopkins's wallet out of his pocket. Kicklighter then stated, "As soon as Richard got the wallet, we ran across the street. When we got in Debbie's house, [Hinman] said he had stabbed the guy. [Gutierrez] pulled the guy's wallet out and started counting it. Everybody was supposed to get $5, but he went to the store." Gutierrez told the police that after Hopkins had been stabbed in front of the apartment house, he saw three $20 bills lying on the ground. He admitted taking the money and stated that later Hinman and Kicklighter wanted to "go halves" on the money, but he refused.

Hinman was apprehended by the police shortly after the homicide. When asked why he had run, Hinman stated "my two friends were going to rob this man ... I didn't want to be associated in the robbery." The trial court admitted this statement despite the absence of proper warnings. The California Court of Appeals held that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (*Miranda*), but found the error to be harmless beyond a reasonable doubt.

After being denied a petition for hearing in the California Supreme Court, Hinman sought federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Hinman attacked his conviction, arguing, among other things, that the admission into evidence of his statement concerning the robbery violated his *Miranda* rights. The district court assigned the case to a magistrate who recommended that the district court grant Hinman's relief. The district court agreed with the magistrate that admission into evidence of Hinman's statement, which was obtained without the warnings mandated by *Miranda*, was not harmless error beyond a reasonable doubt. Thus, the district court issued an alternative writ requiring Hinman's release or retrial.

## II

The State argues that the grant of a writ of habeas corpus to a state prisoner based on findings of fact made by a United States Magistrate pursuant to 28 U.S.C. § 636(b)(1)(B), is an unconstitutional delegation of judicial power under Article III. Furthermore, the State contends that such a delegation is incompatible with principles of federalism and comity to the extent that it allows state court judgments on habeas corpus petitions to be set aside by officers who are not Article III judges. We first consider the constitutional attack.

## A.

■ In *United States v. Saunders*, 641 F.2d 659 (9th Cir. 1980), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981), we upheld the constitutionality of the Magistrate's Act with regard to the delegation of certain jury scheduling and instruction duties to an officer other than an Article III judge. *See* 28 U.S.C. § 636(b)(3). We reach the same conclusion for the delegation in this case. While magistrates are not Article III judges, *United States v. Saunders, supra*, 641 F.2d at 663, Congress has delegated certain judge-like functions to magistrates. Under the law, magistrates may conduct evidentiary hearings in habeas proceedings, as was done in this case. 28 U.S.C. § 636(b)(1)(B). The Supreme Court has recognized that Congress may establish "legislative courts" whose judges do not enjoy Article III protections, when "necessary and proper" to resolve cases arising under the substantive powers conferred upon Congress by Article I. *See, e.g., American Insurance Co. v. 356 Bales of Cotton (Canter)*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828) (territorial courts); *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (delegation of fact-finding to administrative officers in claims under the Longshoremen's and Harbor Workers' Compensation Act); *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973) (local matters arising in the District of Columbia); *Gosa v. Mayden*, 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973) (Court of Military Appeals).

In *Saunders*, we observed that the Supreme Court has suggested that Congress's delegation power is not unlimited, *Glidden Co. v. Zdanok*, 370 U.S. 530, 549, 82 S.Ct. 1459, 1472, 8 L.Ed.2d 671 (1962), and that "inherently judicial" tasks must be performed by Article III judges. *United States v. Saunders, supra*, 641 F.2d at 663. However, we pointed out that the Supreme Court has recently allowed magistrates to perform "inherently judicial" tasks when they do so under the supervision of an Article III judge. *Id.* In *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), the Supreme Court faced a challenge to Congress's power to delegate certain fact-finding and recommendation functions with respect to a suppression motion in a criminal case. The Court stated that Congress was alert to Article III values when it vested such decision making power in magistrates and thus made it clear in enacting 28 U.S.C. § 636 that the ultimate decision rests with the district court. The Court stated:

> We need not decide whether, as suggested by the Government, Congress could constitutionally have delegated the task of rendering a final decision on the suppression motion to a non-Art. III officer.... Congress has not sought to make any such delegation. Rather, Congress has provided that the magistrate's proposed findings and recommendations shall be subjected to a *de novo* determination 'by the judge who ... then exercise[s] the ultimate authority to issue an appropriate order.'

*Id.* at 681–82, 100 S.Ct. at 2415–16, *quoting* S.Rep.No.625, 94th Cong., 2d Sess. 3 (1976). *See also Mathews v. Weber*, 423 U.S. 261, 271, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976).

Although magistrate evidentiary hearings and subsequent recommended disposition of habeas corpus petitions might be considered "inherently judicial" tasks, under *Raddatz* delegation of those responsibilities cannot be considered unconstitutional as the district judge retains the power to make the final decision. The district judge

could, at the request of the habeas corpus petitioner, or on his own motion, conduct his own evidentiary hearing if he deemed it necessary.[1] *See Wingo v. Wedding*, 418 U.S. 461, 486–87, 94 S.Ct. 2842, 2855–56, 41 L.Ed.2d 879 (1974) (Burger, C. J., dissenting).

## B.

■ The State also contends that magistrate habeas hearings involving state prisoners violate principles of comity and federalism. We conclude they do not. It is true that the Supreme Court has demonstrated a growing concern for comity and federalism considerations governing federal court intervention in state court adjudications. *See Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The State's argument, however, does not challenge the right of the district court to pass on habeas corpus petitions of state prisoners. The attack is solely upon the use of magistrates to do so. But the State has failed to indicate how an evidentiary hearing held by a non-Article III officer causes any greater interference with a state's right to conduct its own criminal proceedings than an evidentiary hearing held by an Article III judge. The position of the State, therefore, must go to a different level: that comity and federalism prohibit any interference with a state court judgment except by an Article III judge.

In *Brown v. Allen*, 344 U.S. 443, 500, 73 S.Ct. 397, 442, 97 L.Ed. 469 (1953), the Supreme Court decided that federal habeas corpus relief must be available to permit state prisoners to relitigate the merits of constitutional questions already litigated at the state level, else a state court would have a final say on constitutional questions

which Congress, by the Act of 1867, provided it should not have. However, granting jurisdiction to federal courts to examine alleged unconstitutional restraint of prisoners by the state created an area of potential conflict between state and federal courts. *See Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950). Thus, Congress enacted several provisions specifically designed to alleviate this tension. For instance, the federal habeas statute provides that a state petitioner must first exhaust his remedies in state court so that the state will have the first opportunity to correct constitutional defects whenever possible. 28 U.S.C. § 2254(b). Similarly, section 2254(d) provides that determinations of fact by a state court of competent jurisdiction and evidenced by a written finding or opinion shall be presumed to be correct, unless one of several specified conditions is found to exist or unless the habeas court concludes that the state court determination was not fairly supported by the record. *See Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981) ("This interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of all state courts.").

The State would have us hold that besides these safeguards already provided for by Congress, an additional safeguard, that of an independent judiciary, is demanded by the Constitution's federalism concerns. The State appears to be arguing that the recommendation-disposition procedure provided for in the Magistrate's Act, far exceeds the judicial prerogative relinquished by the states to the federal government upon the adoption of our constitutional plan. *See* Note, *Article III Limits on Article I Courts:*

---

1. 28 U.S.C. § 636(b)(1)(C) states that:
   [T]he magistrate shall file his proposed findings and recommendations under subparagraph (B) with the court and a copy shall forthwith be mailed to all parties. Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by the rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

*The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act,* 80 Colum.L.Rev. 560, 588 (1980). However, the State provides us with neither historical authority nor compelling argument to support this theory.

There is no doubt that the tenure and salary provisions of Article III were intended by the framers of the Constitution to protect the proper allocation of power among the branches of the national government, as well as to provide a check on those branches should they attempt to encroach upon the states' domain. *See id.* at 582–83. Although we can envision circumstances in which the states have a significant interest in an impartial federal forum insulated from influence by the federal legislative or executive branches, the State has failed to show the presence of such circumstances in all stages of habeas proceedings involving state prisoners. Congress passed the Magistrate's Act to increase the overall efficiency of the federal judiciary without substantially increasing the number of federal judges. Congress recognized that, given the avalanche of additional work created for the district courts by new statutes and regulations, some sort of innovative judicial assistance program was necessary. *Mathews v. Weber, supra,* 423 U.S. at 267–68, 96 S.Ct. at 552–53. There may be situations where the need for an independent federal judiciary in all stages of adjudication is so strong that such an efficiency goal must succumb to federalism concerns. Here, however, the State has failed to point out what additional risks are incurred when a non-Article III officer assists an Article III judge by holding evidentiary hearings and making recommendations to the district court. This is especially true in light of the fact that the district judge retains the power to reject or modify the magistrate's recommendation. 28 U.S.C. § 636(b)(1)(C).

■ The State also argued that the overturning of state court judgments by Article I officers constitutes an affront to state autonomy and erodes the faith of the citizens of California in the authority of its judicial process. That contention cannot be considered meritorious in light of the present statutory scheme under which the district judge retains the power to make the final decision on an application for writ of habeas corpus.

### III

■ The State next contends that Hinman should not be permitted to utilize federal habeas to attack collaterally his conviction, as he has had a full and fair opportunity to litigate his *Miranda* claim in the state courts. The State relies primarily on the Supreme Court decision of *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), where the Court held that once a state has provided an opportunity for a full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief because evidence obtained in an unconstitutional search or seizure was introduced at his trial. *Id.* at 494, 96 S.Ct. at 3052.

The Court reasoned that Fourth Amendment violations differ from violations of other constitutional rights because they do not tend to impugn the integrity of the fact-finding process or render evidence inherently unreliable. Rather, the exclusion of admittedly reliable and probative evidence from the criminal fact-finding process is justified on the grounds that it deters unconstitutional or otherwise unlawful police conduct. *See id.* at 484–90, 96 S.Ct. at 3047–50. However, the costs of the exclusionary rule are great, as it "deflects the truthfinding process and often frees the guilty." *Id.* at 490, 96 S.Ct. at 3050. The Court concluded that the additional deterrent effect, if any, that collateral review of search-and-seizure claims provides, is small in relation to these costs. *Id.* at 493, 96 S.Ct. at 3051. Furthermore, the Court suggested that habeas relief should be available primarily for the vindication of constitutional rights that affect the determination of the accused's guilt or innocence, which is not the case in a typical Fourth Amendment claim. *Id.* at 491 n.31, 96 S.Ct. at 3051 n.31. *See* Cover & Aleinikoff, *Dialectical Federalism: Habeas Corpus and the Court,* 86 Yale L.J. 1035, 1086 (1977).

The State argues that claims based on violations of *Miranda* should be similarly treated. The State would distinguish violations of the fifth amendment in the form of involuntary or coerced confessions resulting from threats, brutality or other types of coercion on the one hand, from the mere failure to provide an acceptable *Miranda* warning on the other. The latter, the State contends, does not interfere with the truth-finding process and is simply a judicially created prophylactic rule. As such, the State argues, the *Stone* rule should apply. *See Brewer v. Williams*, 430 U.S. 387, 423, 97 S.Ct. 1232, 1252, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting).

We do not believe, however, the question is open in this circuit. In a brief per curiam opinion, we have rejected this argument. *Patterson v. Warden*, 624 F.2d 69 (9th Cir. 1980).

## IV

The California Court of Appeal held, and the State concedes, that Hinman's statement to the police that his two friends were going to rob Hopkins was made without the protections mandated by *Miranda*. Hinman argues that this statement was improperly admitted. The State challenges this assumption. Even granting that the police procured the statement in violation of *Miranda*, the State argues that it may still be admissible. Specifically, the State argues that if a defendant testifies in his own case, statements otherwise excluded under *Miranda* are admissible for impeachment. Because Hinman testified that he had no intent to rob before he stabbed Hopkins, the State argues that no substantial harm occurred as the statement, which was offered during the State's case-in-chief, would have been admissible as part of the State's rebuttal evidence.

■ Hinman contends we need not reach the issue because, under California constitu-

tional law, statements in violation of *Miranda* cannot be used in rebuttal. *People v. Pettingill*, 21 Cal.3d 231, 237, 145 Cal.Rptr. 861, 578 P.2d 108 (1978). Hinman's argument fails. It is not the California Constitution which is our measuring rod in habeas corpus proceedings, but the federal Constitution. 28 U.S.C. § 2254(a).[2] Our task is to determine whether Hinman's federal constitutional rights have been violated.

This brings us to an analysis of *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). There, the defendant testified in his own defense and denied any intent to sell heroin to an undercover officer. He was then asked whether he made certain statements to the police. These statements were made in violation of *Miranda*. The trial judge instructed the jury that the statements attributed to the defendant could only be used in passing upon the credibility of the defendant and not as evidence of his guilt. The Supreme Court held this to be proper.

■ It is clear that the statements taken in violation of *Miranda* were not used in *Harris* to prove the defendant's guilt. The jury was appropriately instructed. Here, the statements were admitted as evidence of guilt. There was no proper instruction advising the jury of the limited use of the statement. *See United States v. Basile*, 569 F.2d 1053, 1060 n.3 (9th Cir. 1978) (Hufstedler, J., dissenting). *Harris* does not obviate the problem. Therefore, we review this case on the basis that the statement was improperly admitted.

■ The State contends, however, that admission of the statement was harmless beyond a reasonable doubt as required to prevent reversal under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), because there is overwhelming evidence to support Hinman's conviction of felony-murder apart from this statement. Since the error committed in the state trial

---

**2.** 28 U.S.C. § 2254(a) provides:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

court was "a federal constitutional error," *see United States v. Valle-Valdez,* 554 F.2d 911, 915–16 (9th Cir. 1977), we are bound to reverse if "there is a *reasonable possibility* that the error materially affected the verdict." *See id.* at 915 (emphasis in original). In *Chapman,* the Supreme Court held that the "reasonable possibility" test and "harmless beyond a reasonable doubt" test are essentially the same. *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. at 828.

The Court in *Chapman* found reversible error despite the fact that there was a reasonably strong " 'circumstantial web of evidence' " against the defendants. *Id.* at 25, 87 S.Ct. at 829. In a later decision, reaffirming the *Chapman* rule, the Court held the error harmless beyond a reasonable doubt as the case against the defendant was "overwhelming" and "not woven from circumstantial evidence." *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). Thus, to decide whether admission of Hinman's statement constituted harmless error under *Chapman,* we must evaluate the weight of the remaining evidence in support of his felony-murder conviction.[3]

The only basis for sustaining Hinman's first degree murder conviction is on a felony-murder theory. No question is raised as to whether Hinman committed the homicide. The issue is whether a first degree murder conviction can be upheld. The California Court of Appeal specifically found that the case had been improperly submitted to the jury on a premeditation and

deliberation theory of first degree murder since there was insufficient evidence in the record to support an inference of either. But under Cal.Penal Code § 189, a murder committed during the perpetration of a robbery is murder in the first degree. The only theory of first degree felony-murder that was properly submitted to the jury related to the taking of Hopkins's property by Gutierrez.[4]

In order to sustain Hinman's felony-murder conviction based on the robbery of Hopkins by Gutierrez, the State was required not only to prove that Gutierrez had the specific intent to commit the concomitant felony prior to the time of the killing, *People v. Sirignano,* 42 Cal.App.3d 794, 801, 117 Cal.Rptr. 131 (1974), but also to show that Hinman, as an aider and abettor of Gutierrez, had knowledge of Gutierrez's criminal purpose when he assisted him in the commission of the robbery. *People v. Terry,* 2 Cal.3d 362, 401, 85 Cal.Rptr. 409, 466 P.2d 961 (1970), *cert. denied,* 406 U.S. 912, 92 S.Ct. 1619, 32 L.Ed.2d 112 (1972). If Hinman is found to have aided and abetted Gutierrez in the robbery, and the homicide occurred after Gutierrez formed the specific intent to commit the robbery and during the perpetration of that robbery, then under California law, Hinman would be considered a principal and as such guilty of felony murder. *Id.*

The State correctly argues that under California law, the intent to commit the underlying felony may be proven by cir-

---

3. The State contends that this examination would bring us into conflict with *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981). There, the Court directed the federal court to identify its reasons when overturning a state finding of fact in a habeas corpus case. But here, no finding of fact is being attacked. The question is not whether the jury could have found that Hinman had the requisite felony-murder intent based upon the evidence presented to it. Rather our inquiry goes to the strength of the prosecution's case absent the tainted statement. Thus, no finding of fact by the state jury or finding accepted by the California Court of Appeal is being reviewed. For the same reasons, the State's contention that the district court should have applied the clearly erroneous test to the state

jury's findings is rejected. That test applies to factual review entirely different from that charged to the federal court in this instance. *See, e.g., United States v. Flickinger,* 573 F.2d 1349, 1356 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978).

4. The actual instruction read, "If you find that Ricky Gutierrez did not form the intent to take property from Harry Hopkins until after the stabbing of said Harry Hopkins—if Ricky Gutierrez did such act, then you are instructed that Harry Hopkins was not killed in the perpetration of, or an attempt to perpetrate, the crime of robbery, and as such it is not murder in the first degree under the felony murder rule."

cumstantial evidence. *People v. Sirignano, supra,* 42 Cal.App.3d at 801, 117 Cal.Rptr. 131. The State then points to three pieces of evidence in order to establish by circumstantial evidence the prior intent to rob on the part of Gutierrez and the knowledge of that felonious intent by Hinman—the earlier rifling of the glove compartment, Kicklighter's account as to the taking of the wallet, and Gutierrez's contradictory and self-serving statement as to the same incident. We emphasize that we are not called upon to determine whether that circumstantial evidence alone is sufficient for a conviction. The issue is whether the State has demonstrated that this evidence is of such strength that we can say that the improperly admitted statement of Hinman did not, beyond a reasonable doubt, materially affect the verdict; or, alternatively phrased, whether the State has demonstrated that because of the strength of its case, there is no reasonable possibility that the error materially affected the verdict.

■ The State first points to Kicklighter's statement that while Hinman was fighting with Hopkins, Gutierrez took the wallet out of Hopkins's pocket, and as soon as he did, they all ran across the street, and that later there was to be a division of the money. The State contends that this account of the stabbing and the taking of the wallet clearly demonstrates that the group's primary objective was to steal the wallet. The State further contended at oral argument that Gutierrez's conflicting statement that he saw three $20 bills lying on the ground is so unbelievable and self-serving, that it lends further support to the inference that the group planned to rob Hopkins from the start.

Obviously, the fact that the group ran across the street as soon as Gutierrez got the wallet would lend the most support to this inference, since the statement that Gutierrez took the wallet out of Hopkins's pocket while he was fighting with Hinman can just as easily support the inference that Gutierrez was acting independently and spontaneously as it would the inference that it was part of some common objective

of the group. As to the running across the street, although it could be argued that such action implies that Hinman was aware of Gutierrez's plan to rob Hopkins, this action is somewhat ambiguous as Hinman may have run because he had just stabbed Hopkins. The fact that the group ran across the street immediately after the wallet was taken by Gutierrez would have greater significance if there had been no fight between Hopkins and Hinman and no stabbing. It is quite possible that the members of the group began running across the street at the same time, but for different reasons: Gutierrez because he had just stolen the wallet, Kicklighter because he had witnessed this and Hinman because he had just stabbed Hopkins. Although Kicklighter's account of the incident strongly suggests that Gutierrez formed the intent to rob Hopkins prior to the stabbing as required under California law for felony-murder, neither the fact that they all ran across the street right after the wallet was taken nor that they later decided to divide the money, strongly suggests that the main objective of the group was to rob Hopkins. The first of these facts could just as easily have been coincidental, since as discussed above, Hinman probably had stabbed Hopkins near the time the wallet was taken. The fact that they later decided to divide the money could just as likely have been an afterthought by the group rather than the culmination of their original plan.

Another piece of evidence used by the State to support an inference of the robbery intent is the rifling of the glove compartment that took place sometime before the boys encountered Hopkins. The State suggests that this incident, together with the stabbing of Green, are supportive of the position, accepted by the California Court of Appeal, that there was a general intent to steal on the part of the group prior to the killing.

However, no evidence that anything was taken from the car was ever introduced by the prosecution. Rather, the owner of the car testified that everything in the glove compartment had been taken out and scat-

tered on the floor. Gutierrez told the police that the reason he threw the brick through the window was because he was mad and showing off. In light of these additional facts, there is an equally plausible inference that Gutierrez, or possibly the entire group, had the general intent to vandalize that morning, rather than the intent to steal.

The State contends that the stabbing of Green further strengthens the inference that the group had the general intent to steal. But Green testified that the fight began when he mentioned that someone was calling the police. No attempt was made to take any of his property, such as his bicycle, and no demands for money or other property were made when he was surrounded by the group.

By comparison with the circumstantial evidence and possible inferences therefrom, the improperly admitted statement of Hinman goes right to the root of what the State must prove for a felony-murder conviction. While disassociating himself from the enterprise, he specifically states that the event in question was a robbery. Under these circumstances, it cannot be said that the State has proven beyond a reasonable doubt that its case was so strong that the improper admission of Hinman's statement did not materially affect the verdict. Nor can it be said that there is no reasonable possibility that the error materially affected the verdict. The district judge found the State had not met its burden. We cannot say the district judge was wrong.

The writ in question is, of course, directed to that part of the state judgment dealing with first degree murder. The inadmissible statement had no effect upon Hinman's conviction of assault with a deadly weapon.

AFFIRMED.