[Nos. A043191, A042938. First Dist., Div. Four. Aug. 3, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID RUSSELL SILBERMAN et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

James R. Jenner, Public Defender, David R. Feld, Assistant Public Defender, and Jay E. Goodman for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin S. Kaye and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POCHÉ, Acting P. J.—One of the limited number of special circumstance crimes for which the death penalty is authorized is intentional murder "carried out for financial gain." (Pen. Code, § 190.2, subd. (a)(1).)[1] The primary issue presented on these appeals is whether persons who kill in order to prevent discovery of embezzlement committed by one of those persons can be convicted of murder for financial gain even if a bystander is killed but the intended victim survives. Our answer is that both of the persons can be properly convicted of committing murder for financial gain.

### PROCEDURE AND EVIDENCE

Sometime between 11 p.m. and midnight on the evening of October 19, 1979, two bullets were fired into the brain of Yvette Nance while she was seated in an automobile parked near Jack London Square in Oakland. Her companion, Albert Del Masso, suffered serious multiple gunshot wounds but survived. Defendant David Russell Silberman was arrested at the scene. Defendant Gino Tomasso Bengiovanni was arrested several days later at his home in San Bruno.

As a result of this incident, the District Attorney of Alameda County filed a consolidated information against both defendants. In count I of the information, defendants were jointly charged with the murder of Ms. Nance. (§ 187.) Included in this count were special circumstance allegations that the murder was "intentional and carried out for . . . financial gain." (§ 190.2, subd. (a)(1).) Defendants were jointly charged in count II (as subsequently amended) with having assaulted Mr. Del Masso with the intent to commit murder. (Former § 217.) Counts I and II included allegations that during the commission of the respective offenses each defendant

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

had been armed with a firearm (§ 12022, subd. (a)) and each had personally used a firearm. (§ 12022.5.) Count II included the further allegation that during the commission of the assault upon Del Masso great bodily injury had intentionally and personally been inflicted by each defendant. (§ 12022.7.) It was also alleged in count II that Bengiovanni had suffered four prior felonies within the meaning of section 667.5, subdivision (b). Bengiovanni subsequently admitted the priors. Bengiovanni alone was charged in count III with being a past-convicted felon in possession of a firearm capable of being concealed upon his person. (§ 12021.)

As pertinent to the issues raised on these appeals, the record of defendants' month-long trial (which we will judicially notice) supports the following recitals:

Albert Del Masso is the owner of a wholesale grocery firm located in downtown Oakland. He testified that he and Silberman have been "friends and business associates" for eight to ten years. Silberman had helped to "get money out of my corporations" and avoid taxes. Silberman had also been purchasing shares in Canadian and South African gold-producing corporations for Del Masso since 1973. The shares were purchased in the name of several corporations owned by Silberman in order to reduce taxes and because Del Masso "wanted to remain anonymous." In 1974 Del Masso deposited the shares in a Zurich bank. In 1975 Del Masso sent Silberman to Switzerland to "liquidate those assets" worth about $40,000 and use the proceeds to buy 300 ounces of gold, which Silberman was to place in a different "Swiss bank deposit box." Silberman told Del Masso that "he had done that." Silberman provided Del Masso with "documentation" in the form of a "lease agreement" with the bank and a "power of attorney" to gain access to the box.

Del Masso further testified that starting about 1974 Silberman had also purchased gold (apparently in the form of coins and bullion) for Del Masso. Del Masso "put up the money" and Silberman "acted as a broker." Silberman was paid a commission, shared in the profits, and was reimbursed for his expenses incurred in connection with these transactions on Del Masso's behalf. Silberman was always given cash, never checks, to make these transactions. Del Masso was never given receipts, nor did he keep any records or "books" concerning his dealings with Silberman. Del Masso estimated that the total amount of money he furnished to Silberman "to buy both stocks and bonds and all the transactions" was approximately $200,000.

As of October 1979 Del Masso was expecting Silberman to deliver approximately $50,000 worth of "gold stocks." Del Masso had advised Silberman that he (Del Masso) was planning to go to Zurich on October 22d, and

then to Paris and Kenya "with my companion, Yvette." Silberman had agreed to buy approximately $1,200 of Swiss and French currency for Del Masso. Sometime before he was ready to leave on this trip, Del Masso learned that Silberman was "keeping assets" of his own in the same Swiss deposit box that he had "opened" for Del Masso. Del Masso had loaned Silberman $18,500 during the five months prior to October. Silberman received $5,500 of this total about one week before Del Masso was scheduled to leave on the trip. Silberman told Del Masso that "he [Silberman] had gold in the box and . . . that I could recover this money from his gold." Del Masso told Silberman the date on which he and Ms. Nance were leaving for Switzerland in order to go to the Zurich bank and "transfer that box [sic] into a box solely of my own"; that he wanted the stocks delivered before he left; and that "it would be nice to have all of our business transactions concluded" by that date.

Del Masso testified that on October 19th he was in his apartment near Jack London Square when he received a telephone call from Silberman sometime around 7 p.m. Silberman stated that he would be arriving at the Oakland airport from Montreal that night and that he "would be bringing everything down," including the gold stocks he had purchased for Del Masso. He asked Del Masso to "pick him up" at the airport around 10:15. Later that night Del Masso and Ms. Nance drove to the airport in Del Masso's Lincoln Continental. There they met Silberman, who introduced them to "Gino," a friend of Silberman who "came down from Montreal with him." Del Masso made positive in-court identifications of Silberman and of Bengiovanni, who was the person introduced as "Gino."

The four then entered Del Masso's automobile: Del Masso was in the driver's seat, Nance beside him in the front passenger seat, Silberman behind Del Masso, and Bengiovanni behind Nance. Del Masso drove to the area near Jack London Square to get Bengiovanni's vehicle. Most of the conversation during the trip was between Del Masso and Silberman, who exchanged "pleasantries." As they neared Del Masso's office looking for Bengiovanni's automobile, Del Masso saw "a car which resembled David's." Del Masso, thinking that "we had this business to conduct and there would be no better place than to go to my office," asked Silberman "would you like to go to my office?" Silberman replied "No."

Del Masso parked his vehicle and, thinking that Silberman might be "embarrassed" by the presence of Bengiovanni and Ms. Nance, then "turned completely around in my seat" and asked Silberman if he would "like to go for a walk." Silberman replied "No," looked at Bengiovanni, and told him "Do it. I said do it now." Realizing that Silberman and Bengiovanni were now "sitting right up next to each other," Del Masso found himself

"looking down the barrel of a gun" held by Bengiovanni. Del Masso heard a "pop," saw "a little round flame," and then "I became stunned." There were two more "pops."

Del Masso "lunged" for the gun, could not reach it, and then "spun around" and rolled out of his automobile on to the ground. As he lay on the ground, Del Masso implored Silberman "David, David. Don't do this," but Silberman made no response. Del Masso spoke to Silberman because "[h]e gave the orders. . . . He was in charge." Bengiovanni "pointed a gun at me to shoot me as I lay on the ground." Before he could do so, the driver's door swung closed, whereupon Del Masso got up and ran.

Del Masso ran to a loading area where there were a number of "pallets" used for loading with lift trucks.[2] Del Masso saw Silberman with a gun and believed "he was going to shoot me." Bengiovanni was "a little bit further away," and "they had me trapped." After Del Masso picked up one of the pallets and made "a defensive motion" toward Silberman "to deflect the gun, . . . I saw the gun go off." Del Masso threw the pallet at Bengiovanni, who then "disappeared." Del Masso resumed running. He remembered lying on the ground being kicked by Silberman, at which point "I just figured it was over . . . I couldn't defend myself so . . . I just gave up." Del Masso recalled nothing which happened thereafter except "[b]eing in the hospital" and a man "giving me the last rites."

Del Masso went to Switzerland the following month "[t]o find out if my assets were there." He apparently presented the "power of attorney" form Silberman had given him to bank officials, but they would not allow Del Masso access to the deposit box.[3] Prior to October, Del Masso had no idea that his money had been "misappropriated" by Silberman.

Numerous eyewitnesses were able to corroborate Del Masso's testimony and fill in the details which Del Masso was unable to remember. They testified seeing Silberman shoot at the fleeing Del Masso once the pair had left Del Masso's automobile. When Del Masso apparently collapsed in front of a restaurant in Jack London Square, Silberman was observed kicking Del Masso in the head and repeatedly firing at him from point-blank range. The onlookers provided four positive in-court identifications of Silberman. No

---

[2] As previously mentioned, Del Masso testified that he owned a wholesale produce company which was located nearby. He also testified that other produce companies with appropriate loading facilities were "common" in the area near the scene.

[3] Oakland Police Inspector Michael Harnett testified that with the assistance of Swiss police and banking officials, he went to Zurich in July of 1980 and examined the safe deposit box. Bank records disclosed that Silberman was the only person who "had access to that safe deposit box," which did not contain any gold.

witness made a positive identification of Bengiovanni, although one did observe a man flee after Del Masso threw the pallet.

When police reached Del Masso's Lincoln, Ms. Nance's body was found lying on the front seat. The physician who performed the autopsy on the body noted that two bullets had lodged in Ms. Nance's brain and caused her death. One bullet entered through the right cheek, the other through "the back of the head to the right side." The surgeon who treated Del Masso the night of the shooting observed gunshot wounds to his left hand and arm, shoulder, chest, abdomen, back, and head and neck area. Del Masso remained in critical condition after undergoing six to seven hours of surgery. Del Masso stayed in the hospital for approximately two weeks. He had additional chest surgery in March of 1980.

Chester Young, a criminalist employed by the Oakland Police Department, testified that the gun recovered by one of the eyewitnesses could hold up to 13 cartridges. All of the shell casings recovered from the scene had been fired from this weapon. After test-firing the gun, Young was of the opinion that the bullet fired into Ms. Nance's cheek and one of the bullets recovered from Del Masso had been fired from that gun. Young's testimony would support inferences that the bullet which entered Ms. Nance's cheek was fired from a distance of about six inches, and the one which had entered the back of her head was fired from less than four and one-half feet away.

David Silberman testified as follows: He has been a "gold dealer" since 1968. His business dealings with Del Masso began five years later when he began buying first gold bullion and then gold coins for Del Masso.[4] In 1975, Silberman "liquidated" some of Del Masso's assets; opened a deposit box for Del Masso in a Swiss bank; and put nine kilograms of gold in the box. The box "was in my [Silberman's] name." Gold was worth "around $140 an ounce" at the time.

As of October of 1979, Silberman had borrowed between $70,000 to $80,000 from Del Masso. Del Masso had given Silberman $50,000 to purchase gold stocks, but Silberman had used some of this money for "personal

---

[4] As Silberman testified, private possession of gold in bullion form was illegal until December 31, 1974. (See 12 U.S.C. § 95a; Exec. Order No. 11825, 40 Fed.Reg. 1003 (Dec. 31, 1974).)

A total and uncompromising divergence exists in the testimony of Del Masso and Silberman concerning certain of their alleged dealings. The details of these transactions, which may have involved massive sums and fraud on a staggering scale, might be of interest to the Internal Revenue Service or the Franchise Tax Board, but they are not relevant to these appeals. The evidence narrated in the text has therefore been confined to those incidents with respect to which Silberman and Del Masso were in substantial agreement and which are germane to resolution of the issues presented.

expenses." Without Del Masso's permission, Silberman in 1976 had taken the nine kilograms of gold from the Swiss deposit box because he "needed the money for something." The gold was then worth about $125 per ounce, but in October of 1979 the value had increased to about $380 per ounce. Silberman was not "able to replace" the gold as of the latter date. Silberman intended to replace "everything that had been borrowed" from Del Masso, which amounted to between $200,000 and $250,000. Silberman had not told Del Masso about the "missing" gold which Silberman admitted having "removed." Silberman had "financial difficulties" which started in 1975 and which "never really did" end.

Silberman testified that when he telephoned Del Masso on October 19th he was in Oakland, but he told Del Masso that he was in Vancouver. Silberman knew that Del Masso was going to Europe later that month and that Del Masso "intended to go into the bank . . . into the [safe deposit] box." Silberman told Del Masso that "I was just leaving Vancouver and could he pick me up at the airport." Del Masso asked if he could bring "his lady friend . . . along with him," and Silberman replied "Sure."

Bengiovanni was "a very close friend" whom Silberman had known since 1971. Silberman had met Bengiovanni earlier on the 19th, and Bengiovanni had agreed to go with Silberman to meet Del Masso. Silberman was "apprehensive" about the meeting because he had some but not all of the securities Del Masso wanted before he left for Switzerland. Silberman "wanted to buy . . . some time." Silberman wanted Bengiovanni present "as a buffer" because Silberman thought "Del Masso would be upset if he did not get all the stocks" and "if I went there by myself, there could be a problem."

Silberman further testified that after he and Bengiovanni met Del Masso and Yvette Nance at the airport, they left in Del Masso's Lincoln with Bengiovanni sitting behind Del Masso and Silberman seated behind Ms. Nance. After they had driven to the area of Jack London Square and spotted Silberman's automobile, Del Masso parked his Lincoln. Bengiovanni "appeared to be sleeping." Del Masso stated to Silberman: "We have some business to talk over. Do you want to go up to the office?" Silberman replied "No," and stated in effect that it "would be tough" for him to meet with Del Masso the following day. Del Masso then "turned around . . . in his seat," pointed a gun at Silberman, and stated, "Let's go for a walk."

Silberman "grabbed at the gun," which "went off" more than once. Silberman and Del Masso struggled for the gun. Silberman "got the gun away from him" and shot Del Masso. As Del Masso "started to open the car [door]," Silberman "pointed the gun at him and shot." In a daze,

Silberman started pursuing Del Masso. Silberman chased Del Masso to Jack London Square, where "I just kept shooting him."

Silberman testified that he never saw Bengiovanni with a gun that night. Bengiovanni did not shoot Del Masso. Neither Silberman nor Bengiovanni shot Ms. Nance.

Defendant Gino Bengiovanni testified as follows: David Silberman is a good friend whom he has known for about eight years. Bengiovanni spoke to Silberman on the morning of October 19th and agreed to "meet a friend" of Silberman. Silberman stated that he owed Del Masso about $120,000, consisting of "monies that he had borrowed and . . . gold that he had taken." Silberman wanted Bengiovanni to accompany him because "Del Masso wouldn't talk about business if I was there," and that otherwise Del Masso "might have intimidated" Silberman. Bengiovanni was told that Silberman "didn't have whatever it was that he was supposed to have" for Del Masso. Silberman and Bengiovanni "planned" to "act as though we had come in on a plane together" when they met Del Masso.

Bengiovanni and Silberman met at a restaurant at about 7 p.m. that day. After dining at separate tables, they drove in Bengiovanni's van to the airport, arriving there between 8:30 and 9. They waited in the terminal until they met Del Masso and Ms. Nance. When they entered Del Masso's Lincoln, Bengiovanni sat behind Del Masso and Silberman sat "on my right." As Del Masso drove, he and Silberman talked about gold prices. Bengiovanni was "dozing."

Bengiovanni testified that while he was "almost asleep still," he heard "kind of a popping sound." He did not open his eyes but "just laid there, and then I heard it again." Bengiovanni "did not attach . . . much significance" to the noises. He did eventually open his eyes "because of the smell." Bengiovanni saw Silberman "kind of sitting forward in his seat," with Del Masso "trying to get out the driver's door." Del Masso had blood on his back and "a bullet hole . . . in his back." Silberman "seemed kind of wild looking."

According to Bengiovanni, Silberman then got out of the vehicle and pursued Del Masso. Bengiovanni saw that Ms. Nance was "lying over like she was sleeping." Bengiovanni "got out of the car and looked over toward my left and saw a figure there. I couldn't describe it . . . [a]nd I just ran the other way." He ran several blocks and "I still saw that figure." Bengiovanni then went home.

Bengiovanni denied having a gun on the night of October 19th. He did not shoot either Del Masso or Nance. He did not "make any plans with

. . . Silberman or do anything of an illegal nature regarding Mr. Del Masso, including killing him." Silberman did not ask him to "come along as muscle."

The prosecution presented rebuttal evidence in the form of statements made by each defendant following his respective arrest. Lieutenant Patrick Regan testified that two days after the shooting Silberman told him that Ms. Nance's presence was "unexpected"; that it was "Gino" who stated "Do it now" and had then produced a gun and started firing; and that he (Silberman) had thereupon "jumped out of the car."

Sergeant Frank Mellott testified that during the course of an interview on October 23d Bengiovanni told him that Silberman had asked him to go and "look like muscle" when Silberman met a man to whom Silberman "owed . . . a lot of money . . . that he was supposed to reimburse," and that the man "wanted it back." According to Bengiovanni, after he and Silberman met "Mr. D." at the airport and "drove down to the produce area in Oakland[,] . . . Mr. D. . . . started to get out of the car, and when Mr. D. turned around, . . . Silberman pulled a gun and started shooting. . . . At that point Mr. Bengiovanni said that he split, he left the scene." Sergeant Richard Randall corroborated Mellott's testimony that during the interview Bengiovanni had stated that Silberman asked him to "come along and look like muscle" and that it was Silberman who "pulled out a gun and started shooting."

Silberman took the stand to deny having told Lieutenant Regan that he saw Bengiovanni produce the gun and start shooting.

After three days of deliberations, the jury returned verdicts finding that (1) both defendants were guilty as charged on all counts; (2) the special circumstance allegations were true as to both Silberman and Bengiovanni; (3) all other enhancement allegations against Bengiovanni were likewise true; and (4) the enhancement allegations against Silberman in count II were true but those in count I were not true.

With respect to the murder count, the jury was unable to return verdicts during the penalty phase of the trial. After the prosecution announced its intention not to seek a retrial, all parties and counsel stipulated that the court could fix and impose the penalty of life imprisonment without possibility of parole on the murder count in accordance with section 190.4, subdivision (b).

Each defendant appealed from the ensuing judgment of conviction. In an unpublished opinion filed March 25, 1985, Division Five of this court

concluded that the only substantive charge which had to be reversed was Bengiovanni's conviction for violating section 12021. The causes were remanded for resentencing in order to allow the trial court an opportunity to correct minor sentencing errors and to consider whether to exercise its discretionary power pursuant to section 1385 to dismiss the special circumstance findings in light of *People* v. *Williams* (1981) 30 Cal.3d 470 [637 P.2d 1029].

When proceedings were resumed in the trial court, defendants presented evidence and argument in support of their motions to dismiss the special circumstance findings. Those motions were denied, whereupon the trial court resentenced defendants. ■ ■ ■ ■ These timely appeals followed.[5]

REVIEW

I

Both Silberman and Bengiovanni contend that there is an absence of substantial evidence supporting the special circumstance findings. Our function in evaluating these claims, which does not extend to deciding whether this court is convinced beyond a reasonable doubt of defendants' guilt, is governed by fixed and familiar principles. ■ " 'When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a[ny] rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citations.] In applying this test, we must 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 578 [189 Cal.Rptr. 855, 659 P.2d 1144]; accord

---

[5] In his notice of appeal Silberman purports to appeal "from the judgment and sentence" as well as the trial court's order denying his "motion to strike the special circumstance finding." An appeal from both the judgment and the sentence is redundant: "The judgment is the sentence and appealing from both is tautological. The affirmance of the judgment carries with it the affirmance of the sentence." (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33, fn. 1 [9 Cal.Rptr. 793, 357 P.2d 1049].) This duplication does not, however, work to Silberman's disadvantage, because either designation in a notice of appeal suffices to authorize review of the judgment or its functional equivalent (see § 1237, subd. (a)) and all orders which preceded entry of that judgment. Because the order denying Silberman's motion to dismiss the special circumstance finding was made prior to the resentencing which constitutes the judgment (see *People* v. *Flores* (1974) 12 Cal.3d 85, 93, fn. 6 [115 Cal.Rptr. 225, 524 P.2d 353]), it may be reviewed on appeal from the judgment. That order not being appealable, the purported appeal from it will be dismissed. (See *People* v. *Succop* (1966) 65 Cal.2d 483, 486, 490 [55 Cal.Rptr. 397, 421 P.2d 405]; *People* v. *Valenti* (1957) 49 Cal.2d 199, 204, 209 [316 P.2d 633].)

Bengiovanni's appeal is correctly taken from the judgment alone.

*People* v. *Bishop* (1988) 202 Cal.App.3d 273, 284 [248 Cal.Rptr. 678]; see *People* v. *Dominick* (1986) 182 Cal.App.3d 1174, 1207 [227 Cal.Rptr. 849].) These principles apply regardless of "[w]hether the evidence presented at trial is direct or circumstantial[—]the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253] [original italics]; see *People* v. *Ruiz* (1988) 44 Cal.3d 589, 611 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Bloyd* (1987) 43 Cal.3d 333, 346-347 [233 Cal.Rptr. 368, 729 P.2d 802].) We must bear in mind that circumstantial evidence by itself suffices to establish proof of guilt beyond a reasonable doubt. (See, e.g., *People* v. *Bloyd, supra,* at p. 347; *People* v. *Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 424 [90 Cal.Rptr. 417, 475 P.2d 649].)

Because much of the evidence was circumstantial and conflicting, we deem it appropriate to preface our discussion of defendants' claims by establishing what the record—viewed most favorably to the judgments—shows happened at the time Ms. Nance was killed. We take the following as proven: When Mr. Del Masso halted his Lincoln near his office, he was in the driver's seat, Nance was beside him in the front passenger seat, Silberman sat in the rear seat behind Del Masso, and Bengiovanni was seated behind Ms. Nance. Once the Lincoln was parked, it was an awake Bengiovanni who, at Silberman's direction, produced the weapon and fired the first bullet into Del Masso. While all concerned were still in the vehicle, Bengiovanni then fired the fatal shots (the two "pops" heard by Mr. Del Masso) into Ms. Nance's skull. Silberman did not get his hands on the pistol and did not use it until he commenced his pursuit of Mr. Del Masso. Bengiovanni then left the scene.

With these preliminaries concluded, we now turn to the particular arguments raised by defendants.

*Silberman*

The prosecution argued that defendant Silberman was guilty of murder for financial gain because he set out to have Mr. Del Masso killed in order to prevent Del Masso from discovering Silberman's "misappropriations" and demanding repayment. Silberman contends that the special circumstance finding returned by the jury is defective as a matter of law because there is a total absence of evidence showing that he had a pecuniary motive for killing Ms. Nance or that he obtained any financial gain from her death. He further argues that even if he had a monetary motive to kill Mr. Del Masso, and even if Del Masso had died, "there was no future financial

gain whatsoever that would or could directly result" to Silberman as the result of Del Masso's death. Citing the limiting construction adopted by the Supreme Court in *People v. Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], that "the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant," Silberman submits that he had already realized all possible financial gain from Del Masso; because he could not benefit further from Del Masso's death, Silberman contends that it could not qualify as "an essential prerequisite to[ ] the financial gain sought." These arguments possess a superficial allure, but they do not withstand scrutiny.

■    Contrary to Silberman's arguments, we do not read the *Bigelow* construction as stating an inflexible sine qua non for all murder for financial gain prosecutions. The problem confronted by the *Bigelow* court was that the language of subdivision (a)(1), if "[r]ead broadly, . . . would create a large area of overlap between this special circumstance and that of felony murder (§ 190.2, subd. (a)(17)), since most robberies, as well as many burglaries, kidnapings and arsons, are committed for financial gain." (37 Cal.3d 731 at p. 750.) The court adopted the limiting construction quoted above in order "to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant. Such a limiting construction will not prejudice the prosecution, since there will remain at least one special circumstance—either financial gain or felony murder—applicable in virtually all cases in which the defendant killed to obtain money or other property." (*Id.* at p. 751.)

It is crucial to place *Bigelow* in its proper context. The court's concern was directed to the harmful overlap between statutes making the same conduct criminal. (See *People v. Edelbacher* (1989) 47 Cal.3d 983, 1025 [254 Cal.Rptr. 586, 766 P.2d 1]; *People v. Howard* (1988) 44 Cal.3d 375, 409-410 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Freeman* (1987) 193 Cal.App.3d 337, 339 [238 Cal.Rptr. 257]; cf. § 654.) The limiting construction protects the defendant in those situations where both felony murder and murder for financial gain may be charged. But the court has subsequently concluded that *"Bigelow's* formulation should be applied when it is important to serve the purposes underlying that decision, but that it is not intended to restrict construction of 'for financial gain' when overlap is *not* a concern." (*People v. Howard, supra,* at p. 410 [original italics]; see *People v. Hamilton* (1989) 48 Cal.3d 1142, 1178 [259 Cal.Rptr. 701, 774 P.2d 730] ["Our recent decision in *People v. Howard* . . . endorsed a broader interpretation of the statute for cases . . . in which felony murder is not charged"]; *People v. Edelbacher, supra,* at p. 1027.) This common sense approach has

not been difficult to implement. Murder for financial gain is inapplicable in cases where the killing obviously constitutes felony murder. (See, e.g., *People* v. *Adcox* (1988) 47 Cal.3d 207, 246 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Silva* (1988) 45 Cal.3d 604, 638 [247 Cal.Rptr. 573, 754 P.2d 1070]; *People* v. *Montiel* (1985) 39 Cal.3d 910, 927-928 [218 Cal.Rptr. 572 [705 P.2d 1248]; *Newberry* v. *Superior Court* (1985) 167 Cal.App.3d 238, 242 [213 Cal.Rptr. 129].) The special circumstance of murder for financial gain has been properly found where a person kills to obtain insurance proceeds (*People* v. *Hamilton, supra*; *People* v. *Roehler* (1985) 167 Cal.App.3d 353 [213 Cal.Rptr. 353]) or hires another to commit the killing (*People* v. *Freeman, supra,* 193 Cal.App.3d 337) or the person hired to "rough up" someone who ends up committing homicide (*People* v. *Howard, supra*) or one who kills to avoid having to repay a debt (*People* v. *Edelbacher, supra*).

The last-mentioned and most recent decision by our Supreme Court is especially instructive. The defendant in *People* v. *Edelbacher, supra,* 47 Cal.3d 983, murdered his former wife, whom he had been ordered to pay money for child support and division of their community property. He was convicted of murder for financial gain and sentenced to death. ■ In the course of affirming the guilt phase aspect of that judgment, the Supreme Court rejected the defendant's argument that the death of his former wife "did not result directly in any financial benefit to him":

"Proof of actual pecuniary benefit to the defendant from the victim's death is neither necessary nor sufficient to establish the financial-gain special circumstance. As we recently explained, 'the relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain.' (*People* v. *Howard, supra,* 44 Cal.3d at p. 409.) . . . [¶] Defendant argues . . . that the term 'gain' means a profit or increase and does not include the mere avoidance or cancellation of a financial obligation. The proposed construction is artificially restrictive and does not accord with the ordinary meaning of the statutory term. In common usage, the cancellation of a debt or the avoidance of a loss constitutes a financial benefit or gain. The construction urged by defendant would result in an arbitrary and irrational distinction, moreover since a killing to avoid a loss is as basely motivated and repugnant as a killing for a positive reward or profit. We conclude that a murder for the purpose of avoiding a debt is a murder for financial gain within the meaning of section 190.2, subdivision (a)(1)." (*People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025.)[6]

---

[6] Justice Kaufman's lead opinion in *Edelbacher* was not joined by any other member of the court. An examination of the concurring and dissenting opinions, however, establishes that the court was in fact unanimous on this point.

██ *Edelbacher* leaves no room for doubting that Silberman had a pecuniary motive for seeking Mr. Del Masso's death or that he would profit thereby. The exact value of the embezzled gold, unpaid loans, and outstanding uncompleted gold stock transactions owing to Del Masso from Silberman is not established with total precision. According to Silberman's own testimony, the total sum was at least $200,000, which was more than four times the amount owed by Edelbacher. (See *People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1026.) As will be shown, there is no principled basis for placing Silberman's defalcatory commitments on a different footing from Edelbacher's judicially ordered obligations.

The contention that Silberman may have already achieved his gain from Mr. Del Masso prior to October 19th is only partially correct, and thus falls short of demonstrating an insuperable legal defect in the special circumstance finding. It is true that Del Masso's death would not put additional money in Silberman's pockets. But Del Masso's death was "an essential prerequisite" to Silberman preserving the gain he had already realized. Killing Mr. Del Masso would relieve Silberman of the necessity of restoring the assets he had, to use the prosecutor's gentle term, "misappropriated." If, as appeared inevitable, Del Masso would discover Silberman's misappropriations, only Del Masso's death would prevent that discovery and the equally inevitable demand for restitution. Averting that demand would amount to a financial benefit for Silberman, who would be spared the necessity of making repayment. Given his extremely precarious financial state, Silberman could only view the prospect of repayment with a dismay that was the midwife to a homicidal panic intended to effect a unilateral cancellation of his debt to Del Masso. "[T]he cancellation of [that] debt or the avoidance of [that] loss constitutes a financial . . . gain . . . within the meaning of section 190.2, subdivision (a)(1)." (*People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025.)

We have it from the Supreme Court that "[p]roof of actual pecuniary benefit to the defendant from the victim's death is n[ot] necessary . . . to establish the financial-gain special circumstance." (*People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025; see *People* v. *Howard, supra,* 44 Cal.3d 375 at p. 409, fn. 9.) The fact that the prosecution was unable to trace a pecuniary benefit to Silberman is therefore without consequence. His subjective motivations are more important. "The special circumstance focuses on the defendant's intention *at the time the murder was committed.* . . . . [T]he relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain." (*People* v. *Howard, supra,* at p. 409 [original italics].) "What is relevant is the particular defendant's purpose, whether or not achievable." (*Id.* at p. 410, fn. 10.)

Silberman's debt might technically survive Del Masso's death (see Prob. Code, § 573), but this legal possibility does not preclude a finding that Silberman acted with the expectation of financial gain previously explained. (Cf. *People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1026.) Silberman could well have been motivated by the belief that all trace of these unrecorded transactions would be obliterated by killing Del Masso. We take as proven Mr. Del Masso's testimony that he was first shot by Bengiovanni after Silberman told Bengiovanni "Do it. I said do it now." This sequence is pregnant with inferences. The first is that because Bengiovanni acted as he did in response to Silberman's seemingly innocuous command, Silberman's words had a special meaning for both men. It could further be inferred that knowledge of that meaning demonstrates a preexisting understanding between Silberman and Bengiovanni, an understanding reached during the lengthy period they were together prior to meeting Del Masso and Vance at the airport. The fact that Bengiovanni did not hesitate, did not merely brandish the weapon, but fired it point-blank at Del Masso could lead one to conclude that the preexisting understanding amounted to an agreement that Bengiovanni would kill Del Masso when ordered to do so by Silberman. Indeed, this is the only possible interpretation of the circumstantial evidence compatible with our duties to " 'review the whole record in the light most favorable to the judgment' " and to " 'presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence.' " (*People* v. *Fosselman, supra,* 33 Cal.3d 572 at p. 578.)

There remains only to link Silberman's motive to kill Del Masso with Ms. Nance's death. Whether or not either Silberman or Bengiovanni anticipated that Del Masso would be accompanied by Ms. Nance is irrelevant. Once she did appear, she inescapably came to be included within the lethal plan against her consort. If (as we explain hereafter) Bengiovanni was hired by Silberman to kill Del Masso, both Silberman and Bengiovanni would naturally believe that their respective financial gains could only be preserved and enjoyed if they were not suspected of causing Del Masso's death. It should be remembered that "the relevant inquiry is whether the defendant committed the murder in the expectation that he would thereby obtain the desired financial gain." (*People* v. *Howard, supra,* 44 Cal.3d 375 at p. 409; accord *People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025.) The fact that their plan was frustrated by Del Masso's survival is irrelevant. "What is relevant is the particular defendant's purpose, whether or not achievable." (*People* v. *Howard, supra,* at p. 410, fn. 10.)

The bottom line is that although Silberman had the financial incentive for Del Masso's death, he was an aider and abettor to Bengiovanni, who fired the actual rounds into Ms. Nance's skull. As the aider and abettor of the

actual killer, Silberman could be convicted of murder for financial gain. (See § 190.2, subd. (b); *People* v. *Bigelow, supra,* 37 Cal.3d 731 at p. 750, fn. 11; *People* v. *Freeman, supra,* 193 Cal.App.3d 337 at pp. 339-340.)[7] As the instigator of the lethal events of October 19th, Silberman is no less guilty or culpable than the actual triggerman. (See *People* v. *Freeman, supra,* at p. 340.) The record of the trial has ample substantial evidence to support the jury's finding that Silberman committed murder for financial gain.

## *Bengiovanni*

The prosecution argued that defendant Bengiovanni was guilty of murder for financial gain because he was hired by Silberman to kill Mr. Del Masso, and that he was paid in part with the $5,000 Silberman had borrowed from Del Masso less than a week before the shooting. Bengiovanni contends that the special circumstance finding must be overturned because there is no evidence that he "was promised, received, or intended to obtain anything of financial value." As Bengiovanni sees it, even if he had been hired to kill Del Masso, "it was Nance who was killed. There was no evidence of financial dealings between appellant and the victim, nor was there any suggestion that appellant was paid more to kill Nance or that payment was contingent on this additional killing."

Evidence of Bengiovanni's financial motive is admittedly circumstantial, but substantial nevertheless. Our starting point, as mentioned above, is that Bengiovanni was the original shooter. Why would he shoot Del Masso and kill Nance? Simple friendship for Silberman is a highly dubious motive, and one implicitly rejected by the jury. There is nothing suggesting that Bengiovanni acted in self-defense. Unlike Silberman, Bengiovanni had no debt to Del Masso that he thought would disappear with the debtor's death. Once these possible explanations are excluded, a contract killing looms with increasing plausibility. What other motivation fits Bengiovanni's conduct? Even if it is believed that Silberman brought Bengiovanni along to cow Del Masso, Bengiovanni's murder of Ms. Nance remains utterly inexplicable. But if Bengiovanni was engaged to kill Del Masso, Ms. Nance's death became a tragic inevitability. If Bengiovanni was hired to kill Del Masso, Ms. Nance's unexpected appearance sealed her fate and spelled her doom. As we have seen, the pertinent focus is upon Bengiovanni's subjective intent. (See *People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025; *People* v. *Howard, supra,* 44 Cal.3d 375 at pp. 409-410 [text & fn. 10].) Thinking his first shot would take care of Del Masso, Bengiovanni immediately fired two shots to dispatch Ms. Nance. If Bengiovanni was to be paid for Del Masso's

---

[7] The prosecutor argued to the jury that Silberman and Bengiovanni "were aiding and abetting each other as principals in a planned murder." The trial court thereafter instructed the jury on aiding and abetting liability.

death, he would not unreasonably decide that his future receipt and enjoyment of his remuneration required Ms. Nance's death.

■ ■■■■ ■ The fact that at the trial and at the *Williams* hearing[8] the prosecution was unable to trace the transmission of the $5,000 from Silberman to Del Masso does not exonerate Bengiovanni. "Proof of actual pecuniary benefit to the defendant from the victim's death is n[ot] necessary . . . to establish the financial-gain special circumstance." (*People* v. *Edelbacher, supra,* 47 Cal.3d 983 at p. 1025; see *People* v. *Freeman, supra,* 193 Cal.App.3d 337 at pp. 339-340.) The expectation of financial benefit will suffice. (See *People* v. *Howard, supra,* 44 Cal.3d 375 at p. 409, fn. 9, 412-413.)[9] Even if the prosecution was incorrect in arguing that Bengiovanni had in fact received some payment, it defies logic in the circumstances shown by the record to maintain that Bengiovanni was acting from altruism. The expectation of future payment (regardless of whether some money had already changed hands) is a perfectly sensible inference, one we must presume the jury accepted. (*People* v. *Fosselman, supra,* 33 Cal.3d 572 at p. 578.) The circumstantial evidence supports the jury deciding that Bengiovanni was guilty of committing murder for financial gain in the form of remuneration from Silberman. (See *People* v. *Bloyd, supra,* 43 Cal.3d 333 at pp. 346-347; *People* v. *Fosselman, supra; People* v. *Reilly, supra,* 3 Cal.3d 421 at pp. 424-425.)

There is a separate and independent basis for our conclusion. Even if Bengiovanni acted without the reality or expectation of payment from Silberman, he would be equally liable because he was an aider and abettor of Silberman's scheme to obtain financial gain from Del Masso's death. (See § 190.2, subd. (b); see also note 7 and accompanying text, *ante.*)

---

[8]The prosecution's theory at trial was that the $5,000 borrowed by Silberman from Del Masso shortly before the shooting was earmarked as partial payment for Bengiovanni killing Del Masso. Defendants presented evidence at the *Williams* hearing that none of this money went to Bengiovanni but was in fact used by Silberman for other purposes. Both Silberman and Bengiovanni see this as conclusive proof that they had no agreement for Del Masso's murder. On this direct review of the special circumstance findings returned by the jury it is inappropriate to extend our review beyond the evidence heard by the jury. (See *In re Rogers* (1980) 28 Cal.3d 429, 437, fn. 6 [169 Cal.Rptr. 222, 619 P.2d 415]; *People* v. *Merriam* (1967) 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161].) Defendants' posttrial evidence will, however, be examined in connection with their claim that the trial court abused its discretion in denying their respective motions to set aside the special circumstance findings. (See part II, *post.*)

[9]The court used this hypothetical: "[I]f a man murders his wife intending to benefit from life insurance proceeds, but it turns out that the policies have been cancelled, the special circumstance could still apply." (*People* v. *Howard, supra,* 44 Cal.3d 375 at p. 412.) A variation of this hypothetical would allow the conviction of a person who killed for insurance proceeds, even if those proceeds are never realized, as was the case in *People* v. *Roehler, supra,* 167 Cal.App.3d 353. No authority can be found for the proposition that prompt and effective police work should work a windfall for a killer who is caught before getting or spending money stained with the victim's blood.

II, III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

With respect to Silberman's appeal (A043191), the judgment of conviction is affirmed. The purported appeal from the order denying the motion to dismiss the special circumstance finding is dismissed. (See fn. 5, *ante*.) The clerk of the superior court is directed to prepare an amended abstract of judgment showing that the one-year term of imprisonment imposed on count II pursuant to section 12022 is stayed, said stay is to become permanent upon completion of the two-year term of imprisonment imposed on the same count pursuant to section 12022.5. The clerk is further directed to forward a certified copy of the amended abstract to the Department of Corrections.

With respect to Bengiovanni's appeal (A042938), the judgment of conviction is affirmed.

Channell, J., and Perley, J., concurred.

A petition for a rehearing was denied August 31, 1989, and appellants' petition for review by the Supreme Court was denied November 30, 1989.

---

* See footnote, *ante*, page 1099.