[No. E006753. Fourth Dist., Div. Two. Nov. 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
DERRON McLEAD et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, IIIB & C, IV, V, VI, IX and X.

**COUNSEL**

Handy Horiye, Gregory Marshall, Kimberly J. Grove and Roberta K. Thyfault, under appoinments by the Court of Appeal, for Defendnts and Appellants.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, Acting P. J.**—Defendants, Derron McLead, Derrick Shawn Smith, and David Lamont Lewis, were charged in an information with the murder of Anthony Frazier in count I (Pen. Code, § 187), and with the

special circumstances of murder committed for financial gain (Pen. Code, § 190.2 subd. (a)(1)), murder committed during a robbery (Pen. Code, § 190.2 subd. (a)(17)(i)), and murder committed during a burglary (Pen. Code, § 190.2, subd. (a)(17)(vii)). The information charged the attempted murder of William Rodgers and Phillip LeBlanc in counts II and IV (Pen. Code, §§ 187, 664). Counts III and V charged the kidnapping for the purposes of robbery of William Rodgers and Phillip LeBlanc. (Pen. Code, § 209, subd. (b).) Count VI charged the robbery of William Rodgers. (Pen. Code, § 211 and § 213.5.) Counts VII, VIII, and IX charged conspiracy to murder Anthony Frazier, William Rodgers, and Phillip LeBlanc. (Pen. Code, § 182.) Counts II through VI alleged that a principal was armed with a firearm in those counts. (Pen. Code, § 12022, subd. (a).) The information also charged the personal use of a firearm in counts I through VI for all three defendants. (Pen. Code, § 12022.5 and § 1192.7, subd. (c)(8).)

A jury found the defendants guilty of first degree murder in count I, attempted murder in counts II and IV, kidnapping as a lesser included offense in counts III and V (Pen. Code, § 207, subd. (a)), residential robbery in count VI, and conspiracy to commit first degree murder in counts VII, VIII, and IX. The jury found true the special circumstance that the murder was committed for financial gain but not true the special circumstances that the murder was committed during a robbery and a burglary. It found that a principal was armed with a firearm in the commission of counts II through VI. It also found McLead to have personally used a firearm in the commission of count VI, Smith to have personally used a firearm in the commission of counts I through VI, and Lewis to have personally used a firearm in the commission of counts III and V.

The court sentenced Smith to nine years for count II plus two years for the firearm use enhancement, consecutive terms of one year eight months each for counts III and V, a consecutive sentence of one year four months for count VI, eight months for the use allegation for count I and a consecutive term of two years for an escape conviction, for a total determinate sentence of eighteen years four months. Smith received indeterminate sentences of 25 years to life for count IX consecutive to the determinate sentences and life without the possibility of parole for count I which was consecutive to the sentences for count IX. Sentences for counts IV, VII, and VIII were stayed.

The court sentenced McLead for the determinate terms to nine years plus one year for the armed allegation for count II and to concurrent terms of eight years each plus one year enhancements for counts III and V and to a concurrent term of six years plus a two-year enhancement for count VI. He received an indeterminate sentence for count IX of 25 years to life to run concurrently to the determinate terms. The indeterminate sentence for

count I was life without the possibility of parole to run consecutively to the sentence for count IX and the determinate terms. Sentences for counts IV, VII, and VIII were stayed.

Lewis received the determinate sentence of seven years plus one year for the armed allegation on count II and to concurrent terms for counts III (seven years), V (seven years), and VI (five years). The indeterminate sentence for count IX (25 years to life) ran concurrently to the determinate term, and the indeterminate sentence for count I (life without the possibility of parole) ran concurrently to the sentence for count IX and the determinate terms. The sentences for counts IV, VII, and VIII were stayed.

## FACTS

Phillip LeBlanc helped his sister move to Perris in December 1985. In late December 1985 he returned to Perris with Anthony Frazier in order to sell drugs. On December 31, 1985, Frazier and LeBlanc returned to Los Angeles because they had received a warning. They returned to Perris with William Rodgers, and brought with them an M-1 rifle and more drugs. They also had Rodgers's .22-caliber rifle, a 12-gauge shotgun that belonged to Anthony Durgin, and a baseball bat.

On January 1, 1986, they were selling drugs from the apartment of Weberlee Gobert (W.L.). LeBlanc was the doorman. Around noon or 12:30 p.m., LeBlanc heard a knock. No one answered when LeBlanc asked who was there. When LeBlanc opened the door, he saw Derron McLead holding a .357 magnum. McLead said, "You know what this is," and pushed LeBlanc into the apartment. McLead kicked the rifle that was next to Rodgers who was on the couch. McLead then began hitting Frazier in the face. Approximately 11 people, all holding guns, entered the apartment. LeBlanc also recognized Lucky Pierre and Derrick Smith among the group.

Smith told Frazier that Frazier was in Smith's spot, meaning where Smith sold drugs. McLead gave his .357 to Lucky Pierre and left, taking Rodgers's radio with him. Pierre told LeBlanc that he had warned LeBlanc not to come to Perris and start a business and that now LeBlanc must pay the consequences. When McLead returned about 45 minutes later, David Lewis came with him.

Smith and McLead took LeBlanc into a bedroom, where Smith asked LeBlanc how much money they had made and why LeBlanc had brought Frazier to Perris. Smith said Frazier would die at sundown. LeBlanc was returned to the living room, and Rodgers was taken into the bathroom for three or four minutes. Rodgers was returned to the living room, then Frazier was taken to the bedroom where he remained for at least an hour. While Frazier was in the bedroom, LeBlanc heard Smith say from the bedroom,

"They lied to us." Smith returned to the living room, pointed an Uzi machine gun at LeBlanc and Rodgers, and said they had lied to him about how much money they made. Smith had a roll of money in his hand and added, "I'm rich" or "I'm richer." Lewis and McLead were present at the time. Smith gave Frazier's cocaine to Lucky Pierre and told Pierre to sell it.

McLead struck Frazier with a bat a couple of times during the afternoon. Lewis struck Rodgers with a bat twice that afternoon. Smith struck LeBlanc and said "Didn't I tell you not to bring . . . Frazier out here."

Eugene Burns (Red) and Anthony Durgin, who both worked for Frazier, entered the apartment. Smith asked them why they were helping Frazier instead of working for Smith. Eventually, Red and Durgin were allowed to leave.

Twice McLead told LeBlanc and Rodgers that they could work for Smith selling drugs but said that Frazier would die at sundown. Lewis told them the same thing.

At one point, McLead brought in some yellow rope, and Smith asked him where the handcuffs were. McLead replied he could not find them. Rodgers and LeBlanc were tied together with the yellow rope McLead had brought. Frazier's hands were tied with a lamp cord which McLead cut from a lamp in the apartment. When Smith led Frazier from the apartment, Frazier looked as if he had been injured and said to LeBlanc and Rodgers, "Tell them I just had fun." Lewis and McLead were there at the time. Smith led LeBlanc and Rodgers to a brown Buick and placed them in the backseat. Something covered with a blanket was in the backseat.

Lewis, who was wearing gloves, drove the Buick. Smith got in the front passenger seat. They drove off, but Smith said that he wanted to ride with "Derron." Lewis turned the car around, and Smith walked toward the apartments. LeBlanc saw Smith again in the passenger seat of a beige Toyota truck which was driven by McLead. Lewis got out of the Buick, knocked on the trunk, and asked Frazier if he could breathe. LeBlanc heard Frazier's voice from the trunk say, "Yes."

The Buick followed the Toyota truck. LeBlanc remembered being on the 10 and 60 freeways and taking the 14th/San Timoteo exit. During the trip, Rodgers managed to free his hands. Lewis pointed a gun at them and said, "Go ahead so I can put a bullet in you right now." The truck pulled to the side of the road and the Buick followed. McLead, Smith and Lewis met in front of the Buick. Lewis said to Smith, "Please wait. They want to talk to you." Smith walked around the passenger side of the Buick and said, "I'm killing them all." Smith picked up an M-1 from the front floorboard of the Buick and walked back around the car. LeBlanc and Rodgers lay down in

the backseat. LeBlanc heard gunshots, heard the trunk open and heard more gunshots, felt a thump against the back of the seat, and then felt his shoulder jerk. LeBlanc saw Smith get in the front passenger side of the car and heard the gun cocked. LeBlanc covered his face with his hands and was shot in the hand which spun him around. LeBlanc was then shot twice in the back of the head. LeBlanc heard Smith say, "He ain't dead yet," and then heard two more gunshots, and then heard clicks. Someone said, "Give me another gun." LeBlanc heard more clicks and heard Smith say, "Let's go. They're going to die anyway."

After hearing the truck leave, LeBlanc and Rodgers got out of the Buick. LeBlanc left to get help and managed to get a ride to an Alpha Beta store from Robert Schmidt. Schmidt testified it was after 7 p.m. when LeBlanc ran up to his car. The drive to Alpha Beta was two to three miles, and Schmidt drove seventy-five to eighty miles per hour. At the Alpha Beta store, the police were called.

LeBlanc received a shoulder wound, two wounds to his head, and one to his hand. Frazier died from bullet wounds received in the shooting. Rodgers received bullet wounds to the left chest, the head, the wrist, and the abdomen.

Rodgers testified that he, Frazier and LeBlanc had made $2,000 selling drugs in Perris on December 31, 1985. Rodgers identified McLead as the person who initially entered the apartment with a gun. Rodgers recognized Smith and Pierre from the group that followed McLead into the apartment. Smith asked Frazier why he was in Perris and why he was "messing up for" Smith. McLead was in and out of the apartment on January 1, 1986. When Smith spoke to Rodgers in the bathroom, he asked Rodgers who knew Frazier, Rodgers, and LeBlanc were in Perris. Rodgers told Smith it would not be a good idea to kill them since everyone knew Smith "had Perris tied up" and that Perris was dealing with Smith. Smith replied, "Fuck it. I'll do some time." When McLead took Rodgers's radio he said, "It's mine now." When being transported to San Timoteo Canyon, Rodgers heard Frazier say from the trunk, "Where are we going?" Rodgers testified that Smith first aimed the M-1 at Rodgers from outside the car and shot Rodgers in the left side. Then Rodgers heard the trunk open and heard gunfire. After defendants left, LeBlanc went for help and Rodgers waited at the Buick until police arrived at around 7:34 or 7:38 p.m.

The police had received a call about the shootings a few minutes earlier. Police found a multicolored blanket along with a jammed M-1 rifle, a .22-caliber rifle, and a 12-gauge shotgun.

Red testified that he walked into the apartment followed by McLead but they did not arrive together. Red saw Smith and Lewis in the apartment.

Smith asked Red if he had brought Frazier to Perris. McLead left after about 15 minutes. Red had brought lots of customers to Frazier who was giving customers double the drugs for their money. Red was allowed to leave after one to one and a half hours. It was getting dark then. Smith gave Red and Durgin cocaine when they left and told them they were working for him. About 30 minutes after he left the apartment, Red saw McLead in the parking lot, and McLead said he didn't know what was happening in the apartment.

Roy Thomas testified that Lewis, who was driving a Buick, picked up Thomas at 4:30 or 5 p.m. and took him to W.L.'s apartment. While there Thomas heard Smith say, "I'm going to kill 'em." Thomas stayed only five or ten minutes. When he left, he hid behind a fence. He saw Smith walk a man who was limping to the Buick and put the man in the trunk. Thomas then left, but drove by the apartments later. Thomas thought he saw McLead in front of the apartments 10 to 20 minutes after Thomas left. Over an hour later, Lewis called Thomas and asked him to pick Lewis up at McLead's house. Thomas saw McLead, Smith, and Lewis standing by McLead's truck at McLead's house.

Angela Kong, McLead's girlfriend, testified that she stopped at McLead's house at 7:15 or 7:30 p.m. on January 1, 1986. McLead was not there so she left, went home to change clothes, then returned to McLead's house. She visited with McLead's mother for about 15 minutes before McLead arrived. She saw Lewis and Smith in the garage a few minutes later.

Teri Robinson testified that she arrived at W.L.'s apartment between 5:30 and 6 p.m. on January 1, 1986. She saw W.L., Lewis, McLead, Pierre, Thomas, Smith, two men tied together on the floor, and a third man in the corner. Robinson began talking on the balcony with W.L. when Smith, McLead, and Lewis came out to the balcony. Smith showed her a wad of money and asked her if she wanted to go out to dinner. Robinson saw Thomas and Pierre carry a multicolored blanket covering a long-shaped object and put it in a tan car. Robinson left about 20 to 30 minutes after she arrived. When she returned around 7:10 to 7:15 p.m., all of the men were gone except W.L.

Nancy Flores, who was waiting in a car for Robinson, testified that they arrived at the apartment around 5 or 6 p.m. About five or ten minutes later, Lewis knocked on the car window. Flores saw a blanket being carried to a car by someone. She could not determine who was carrying the blanket. She denied telling police previously that Lewis was carrying the blanket. After his arrest, Lewis led police to a .25-caliber pistol which was fired in the car that night.

*Defense Case:*

Michelle Williams testified that on January 1, 1986, she saw McLead in front of the apartments where W.L. lives when it was "sort of dark" out. McLead left in a blue car. Williams stayed in the area about an hour but did not see McLead again.

McLead's mother testified that McLead was home asleep until 2 or 3 p.m. on January 1, 1986. McLead then worked on Smith's Cadillac, returning to the McLead house around 6 to 6:30 p.m. with Robert Arnold and Ron Pritchett (Sam). McLead remained home from then until Smith and Lewis arrived around 8 p.m. McLead then left around 9 or 10 p.m. McLead's mother denied telling police that McLead was home for only a few minutes on January 1 at around 8:30 p.m.

Anthony Durgin denied working for Frazier. He testified that he arrived at W.L.'s apartment around 4 p.m. He saw W.L., Red, LeBlanc, Rodgers, McLead, Smith, and, later, Lewis. McLead stayed there about 55 minutes and did not have a gun. Later that evening, Durgin saw McLead in the parking lot where McLead said he did not know what was happening in the apartment.

McLead's father testified that around 4 to 4:15 p.m. on January 1, 1986, Smith and Pierre picked up McLead from the McLead residence. McLead returned around 6 p.m. in Smith's Cadillac with Robert Arnold and Sam. At 6:30 p.m. McLead left with Smith and returned 10 to 15 minutes later in a blue Honda.

McLead testified that he slept at home until 2 or 3 p.m. on January 1, 1986. At around 4 p.m., he went to W.L.'s apartment to tell Smith to move his Cadillac from the Chevron station. He talked to Williams outside. Then he walked into W.L.'s apartment right behind Red. He saw a lot of people with guns, talked to Smith about the Cadillac, got Smith's keys to the Honda and left. Durgin came in while McLead was there. He saw Williams again as he was leaving and talked briefly to Red and Durgin in the parking lot. McLead returned to the Chevron station around 5 p.m. At about 5:30 p.m. he went to Sam's to get a tire for the Cadillac. Robert Arnold stopped at the Chevron station to assist McLead with the Cadillac. McLead, Arnold and Sam drove the Cadillac to McLead's house. At about 6:30 p.m., Arnold and McLead returned to the Chevron station to get the blue Honda which McLead drove home. McLead began getting ready to go out. Kong arrived at 7:30 p.m., and McLead tried to avoid her. McLead left again around 9 or 10 p.m. Smith and Lewis arrived in McLead's Toyota truck around 8 or 8:30.

Sam testified that McLead came to his house around 5:30 to 5:45 p.m. to ask for help with a Cadillac tire. Sam worked on the Cadillac at the Chevron station then followed McLead and Arnold to the McLead residence. Sam worked on the blue Honda at the McLead residence until 6:55 p.m. McLead did not leave during that time except to retrieve the blue Honda from the Chevron station.

Robert Arnold testified that he was driving past the Chevron station around 5:33 p.m. when he saw McLead so he stopped and helped him work on a Cadillac. After fixing the Cadillac, Arnold and Sam followed McLead to his residence and Arnold stayed there with McLead 30 to 45 minutes. Arnold took McLead back to Chevron to get the blue Honda; it was dark then.

Smith and Lewis presented no defense evidence.

DISCUSSION

I

*Felony-murder Instructions*

■ All defendants argue that the court committed prejudicial error when it instructed the jury on felony murder in addition to deliberate and premeditated murder. They argue that there is no evidence to support the felony-murder theory and that we are unable to determine whether the jury found the defendants guilty under the felony-murder or premeditated murder theory; therefore, we must reverse the murder judgment in count I. (*People* v. *Morris* (1988) 46 Cal.3d 1, 23-24 [249 Cal.Rptr. 119, 756 P.2d 843].) Defendants do not contend that there is insufficient evidence to support the premeditated murder conviction.

■ Felony murder encompasses murder committed in the perpetration or attempted perpetration of robbery (Pen. Code, § 189), but does not apply when the robbery is committed in the perpetration of a murder. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468], overruled on other grounds in *People* v. *Morris* (1988) 46 Cal.3d 1, 17 [249 Cal.Rptr. 119, 756 P.2d 843] and *People* v. *Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99]; extended to felony murder in *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 752, fn. 13 [175 Cal.Rptr. 738, 631 P.2d 446], superseded by statute on another ground in *People* v. *Boyd* (1985) 38 Cal.3d 762, 773 [215 Cal.Rptr. 1, 700 P.2d 782].) In other words, "a murder would not be considered to have been committed in the course of a robbery 'when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder.'" (*Murtishaw, supra,* 29 Cal.3d

at p. 752, fn. 13.) However, a concurrent intent to commit a robbery will justify a felony-murder instruction. (*Ibid.*)

Defendants clearly acted with the intent to kill Frazier, but there was substantial evidence that they had a concurrent intent to steal. When considering a sufficiency of the evidence issue we determine " 'whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' . . . Evidence, to be 'substantial' must be 'of ponderable legal significance . . . reasonable in nature, credible, and of solid value.' [Citations.]" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

The evidence shows that the defendants intended to put their competitor, Frazier, out of business. As part of their plan, they stole the "assets" of Frazier's business, including the money, drugs, and a radio traded for drugs. They recruited Frazier's runners and initially told LeBlanc and Rodgers they could work for Smith.

The appellate courts have held the felony-murder rule applicable to similar situations in which evidence would support either a premeditated murder theory or a felony-murder theory. These courts have held that the jury should be allowed to determine the questions whether there was a separate concurrent intent to steal and whether the robbery was completed before the murder. (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 207-210 [132 Cal.Rptr. 265]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 163-165 [115 Cal.Rptr. 109].)

While it is true that the felony-murder rule is inapplicable to situations where the felony is completed prior to the killing, that is not the case here. (*People* v. *Sirignano* (1974) 42 Cal.App.3d 794, 801 [117 Cal.Rptr. 131].) When the events form one continuous transaction, the felony-murder rule applies. (*Id.*, at p. 802; *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956].) The elimination of Frazier and the takeover of his business were one continuous transaction. In addition, defendants had not reached a place of temporary safety after the robbery until Frazier was killed. (*Milan, supra,* 9 Cal.3d at p. 195.) Therefore, the robbery was not completed before the murder.

The court did not err in instructing the jury on the felony-murder theory of first degree murder.

## II*

### Instructions on Admissions

. . . . . . . . . . . . . . . . . . . . . . . . .

## III

### Financial-gain Special Circumstance

Defendants join in a three-pronged attack on the financial-gain special circumstance. Penal Code section 190.2 subdivision (a) provides that the penalty for first degree murder shall be death or a term of life without possibility of parole when the jury finds true that the "murder was intentional and carried out for financial gain." Defendants argue that there was insufficient evidence to support the finding that the murder was committed for financial gain, that the court inadequately defined "for financial gain" for the jury, and that the language of the financial-gain special circumstance is unconstitutionally vague and ambiguous.

### A.  Insufficient Evidence

██  " ' "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a[ny] rational trier of fact could have found the defendant guilty beyond a reasonable doubt." [Citations.] In applying this test, we must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.]" (*People* v. *Silberman* (1989) 212 Cal.App.3d 1099, 1110 [261 Cal.Rptr. 45].)  ██  There is sufficient substantial evidence that defendants committed the murder of Frazier to eliminate their competition in the Perris drug market.

Before Frazier arrived, Smith was the drug dealer in Perris. When Rodgers told Smith he should not kill them because Smith had Perris "tied up," that everyone in Perris knew Smith was the drug dealer in town, Smith indicated, "I'll do some time." The day before the murder, Frazier made $2,000 from selling drugs in Perris. Red testified that he brought lots of customers to Frazier who made hundreds of dollars selling drugs and that Frazier was giving double the amount of drugs for the money to customers. Smith was concerned about how much money Frazier had made and quickly took over Frazier's business on the day of the murder. Smith was angry that LeBlanc brought Frazier to Perris and said Frazier was in his "spot."

---

* See footnote, *ante*, page 906.

Smith asked Frazier why Frazier was "messing up" for Smith. Frazier, Rodgers and LeBlanc had been warned to stay out of Perris previously and when McLead entered the apartment he said, "You know what this is." Clearly, defendants were motivated by the desire to eliminate Frazier as a competitor from the drug business in Perris.

Defendants argue that the evidence also indicates that the motivation for the murder was retribution and dominance. Defendants forget that on review we view the evidence in the light most favorable to the judgment. The evidence was sufficient for a rational trier of fact to determine that defendants committed the murder for financial gain.

The California Supreme Court in *People v. Howard* (1988) 44 Cal.3d 375 [243 Cal.Rptr. 842, 749 P.2d 279] stated that the financial-gain special circumstance "was intended to cover a broad range of situations." (*Id.*, at p. 410.) The courts have held financial-gain special circumstances applicable to a murder committed to prevent discovery of embezzlement (*Silberman, supra*, 212 Cal.App.3d at pp. 1111-1114) and a murder committed to avoid paying a debt to the victim. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1025-1026 [254 Cal.Rptr. 586, 766 P.2d 1].)

The relevant inquiry is whether the defendants committed the murder with the expectation that they would thereby obtain financial gain. Frazier, Smith's competitor in the Perris drug market, had made $2,000 the previous day selling drugs. Smith was upset at Frazier's presence and at the amount of money Frazier had made; Smith also took over Frazier's business. The evidence indicates Smith expected he would benefit financially from the elimination of his competitor from the Perris drug market. A murder for purposes of eliminating a business competitor is a murder for financial gain within the meaning of Penal Code section 190.2, subdivision (a)(1).

B., C.*

. . . . . . . . . . . . . . . . . . . . . .

IV-VI*

. . . . . . . . . . . . . . . . . . . . . .

VII

*CALJIC No. 8.80*

The jury was instructed under CALJIC No. 8.80 as follows:

---

* See footnote, *ante,* page 906.

"If you find defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: murder for financial gain, . . .

". . . . . . . . . . . . . . . . . . .

"If you find beyond a reasonable doubt that the defendant was a co-conspirator, an aider or abettor, or the actual killer, then you must also find beyond a reasonable doubt that the defendant intended either to kill a human being or to aid another in the killing of a human being in order to find the special circumstance to be true."

■ McLead and Lewis object to the alternate basis for intent required of an aider and abettor for finding the special circumstance in CALJIC No. 8.80. Specifically, they argue that the phrase, "defendant intended . . . to aid another in the killing of a human being," allows the jury to find true the special circumstance as to an aider and abettor without finding that the defendant had the intent to kill.

In our recent opinion, *People* v. *Robinson* (1990) 221 Cal.App.3d 1586 [271 Cal.Rptr. 403], we stated: "While we agree with defendant that a logical reading of the *Beeman*[6] rule would require modifications of CALJIC No. 8.80 similar to the modifications required in former CALJIC No. 3.01, and while we agree that the reference in the alternate test of CALJIC No. 8.80 to aiding alone is inadequate, we find it unnecessary to decide . . . whether an intent to kill is necessarily found in the words 'aid another in the killing of a human being.'" (*Id.*, at p. 1591, fn. added.)

The court instructed the jury with CALJIC No. 8.81.1 as follows: "To find that the special circumstance, referred to in these instructions as murder for financial gain, is true, each of the following facts must be proved: [¶] 1. The murder was intentional, . . ." The jury had been instructed under CALJIC No. 8.80 that it must decide the special circumstance separately as to each defendant. Therefore, it is certain the jury found that the defendants each possessed the intent to kill. (*Robinson, supra,* 221 Cal.App.3d at p. 1591.)

## VIII

### *Conspiracy*

■ McLead, Lewis, and Smith argue that the evidence shows only a single conspiracy as a matter of law. If not, they argue, the jury should have

---

[6] *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].

been instructed so it could determine whether single or multiple conspiracies existed.

Defendants contend there was evidence of only one agreement with a single unlawful end of elimination of a competitor for financial gain. (*People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453 [237 Cal.Rptr. 113]; *People v. Cook* (1984) 151 Cal.App.3d 1142, 1145-1147 [119 Cal.Rptr. 269].) Although *Morocco* and *Cook* deal with solicitation charges rather than conspiracy, the crimes are analogous. "Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts 'were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result.' [Citations.]" (*Morocco, supra*, 191 Cal.App.3d at p. 1453.) Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means. (*Id.*, p. 1452.) However, these factors are not determinative, and we may consider other facts. (*People v. Williams* (1988) 201 Cal.App.3d 439, 444 [247 Cal Rptr. 200].)

While rejecting the theory that there are as many conspiracies as there are victims, numerous cases give weight to the fact there were multiple victims. (E.g., *Williams, supra*, 201 Cal.App.3d 439; *Cook, supra*, 151 Cal.App.3d at p. 1146.) The court in *People v. Davis* (1989) 211 Cal.App.3d 317, 322-323 [259 Cal.Rptr. 348] agreed with the theory that there are as many solicitations or conspiracies as there are victims; however, the court there looked at other relevant factors in reaching its decision that there were multiple solicitations.

In the present case, the motive and agreement to kill Frazier was formed before the entry into W.L.'s apartment. The motive for the murder of Frazier was the elimination of a competitor to achieve financial gain. From the evidence, it appears that the agreement to kill Rodgers and LeBlanc was not made until later. Lewis and McLead both informed the two men they could work for Smith. The prosecutor argued the theory to the jury that the defendants later formed the intent to kill Rodgers and LeBlanc because it was necessary to eliminate each of them as witnesses. Even though we could ascribe one overall single motive of financial gain to the three murders, the evidence does not support it. (*Williams, supra*, 201 Cal.App.3d at pp. 444-445.) The defendants agreed to kill three specific individuals. Even though the time, place, and means were the same, " 'each separate agreement had its own distinct, illegal end . . . .' [Citation.]" (*People v. Skelton* (1980) 109 Cal.App.3d 691, 718 [167 Cal.Rptr. 636], reversed on other grounds in *People v. Figueroa* (1986) 41 Cal.3d 714, 731 [224 Cal.Rptr. 719, 715 P.2d 680].)

Next, defendants contend that the court should have instructed the jury so that it could determine whether there were single or multiple conspiracies. *Morocco* stated in dicta that this question is one of fact for the jury to determine and that failure to instruct the jury on this question would mandate reversal. (*Morocco, supra,* 191 Cal.App.3d at pp. 1453-1454.) The court in *Davis* rejected this contention. (*Davis, supra,* 211 Cal.App.3d at p. 322.) We agree with *Davis*. The court did not err in not submitting this question to the jury for determination.

### IX, X*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The trial court is ordered to prepare an amended abstract of judgment to reflect the staying of the sentence for counts III and V for all three defendants. The remainder of the judgments are affirmed as to all three defendants.

Timlin, J., and Sullivan, J.,† concurred.

Appellants' petition for review by the Supreme Court was denied February 14, 1991.

---

\* See footnote, *ante*, page 906.
† Assigned by the Chairperson of the Judicial Council.