Filed 4/8/21  P. v. Lewis CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074796 |
| v. | (Super.Ct.No. CR25725) |
| DAVID LAMONT LEWIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Malloy, Judge.  Affirmed.

David Lewis, in pro. per., and Kevin J. Lindsley, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 1989, defendant David Lewis, along with codefendants Derron McLead and Derrick Shawn Smith, was convicted by a jury of one count of first degree murder (Pen.

Code, § 187),[1] with a special circumstances finding that the murder was committed for financial gain (§ 190.2, subd. (a)(1)), as well as two counts of attempted murder (§§ 664, 187), two counts of kidnaping (§ 207, subd. (a)), one count of residential robbery (home invasion, §§ 211, 213.5), and three counts of conspiracy to murder Anthony Frazier, William Rodgers, and Phillip LeBlanc (§ 182). In addition, in counts 3 and 5, the jury found Lewis personally used a firearm (§ 12022.5), and in counts 2 through 6 included findings that a principal was armed with a firearm in those counts (§ 12022, subd. (a)).

Lewis was sentenced to life without possibility of parole (LWOP) for the murder with special circumstances in count 1, plus a determinate term of seven years for the attempted murder in count 2, and a one year enhancement for allegation that a principal was armed with a firearm, for a total of 8 years. The determinate terms for counts 3, 5 and 6 were ordered to run concurrent, and the indeterminate sentence of 25 years to life imposed for count 9 (conspiracy to murder), was ordered to run concurrently to the determinate term. The sentences for counts 4, 7, and 8 were stayed.

Defendant appealed his convictions and sentences, which were affirmed with modifications to the sentence in a partially published opinion in 1990. (*People v. McLead, et al.* (1990) 225 Cal.App.3d 906 (*McLead*).) Subsequently, defendant's petition for review was denied. In 2019, after enactment of section 1170.95 pursuant to Senate Bill No. 1437, defendant petitioned to have his conviction for murder vacated and for resentencing, which was summarily denied, and he appeals.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

At Lewis's request, we appointed counsel to represent him on appeal. Counsel filed a brief declaring he found no arguably meritorious issues and asking us to conduct an independent review of the record under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*). Defendant has filed a supplemental brief challenging (a) whether the trial court followed the mandated procedures of section 1170.95; (b) whether the trial court erred in denying the issuance of an order to show cause; and (c) whether he is entitled to an evidentiary hearing at which he could present evidence that the financial gain special circumstances finding was the product of prosecutorial misconduct. We affirm.

## BACKGROUND

We summarize and abbreviate the facts leading to the convictions from our opinion in the direct appeal, *McLead, supra*, 225 Cal.App.3d at pages 910-913:

Phillip LeBlanc helped his sister move to Perris in December 1985. In late December 1985 he returned to Perris with Anthony Frazier in order to sell drugs. On December 31, 1985, Frazier and LeBlanc returned to Los Angeles because they had received a warning. They returned to Perris with William Rodgers, and brought with them an M-1 rifle and more drugs. They also had Rodgers's .22-caliber rifle, a 12-gauge shotgun that belonged to Anthony Durgin, and a baseball bat.

On January 1, 1986, they were selling drugs from the apartment of Weberlee Gobert (W.L.). LeBlanc was the doorman. Around noon or 12:30 p.m., LeBlanc heard a knock. No one answered when LeBlanc asked who was there. When LeBlanc opened

3

the door, he saw Derron McLead holding a .357 magnum. McLead said, "You know what this is," and pushed LeBlanc into the apartment. McLead kicked the rifle that was next to Rodgers who was on the couch. McLead then began hitting Frazier in the face. Approximately 11 people, all holding guns, entered the apartment. LeBlanc also recognized Lucky Pierre and Derrick Smith among the group.

Smith told Frazier that Frazier was in Smith's spot, meaning where Smith sold drugs. McLead gave his .357 to Pierre and left, taking Rodgers's radio with him. Pierre told LeBlanc that he had warned LeBlanc not to come to Perris and start a business and that now LeBlanc must pay the consequences. When McLead returned about 45 minutes later, David Lewis came with him.

Smith and McLead took LeBlanc into a bedroom, where Smith asked LeBlanc how much money they had made and why LeBlanc had brought Frazier to Perris. Smith said Frazier would die at sundown. LeBlanc was returned to the living room, and Rodgers was taken into the bathroom for three or four minutes. Rodgers was returned to the living room, then Frazier was taken to the bedroom where he remained for at least an hour. While Frazier was in the bedroom, LeBlanc heard Smith say from the bedroom, "They lied to us." Smith returned to the living room, pointed an Uzi machine gun at LeBlanc and Rodgers, and said they had lied to him about how much money they made. Smith had a roll of money in his hand and added, "I'm rich" or "I'm richer." Lewis and McLead were present at the time. Smith gave Frazier's cocaine to Pierre and told Pierre to sell it.

4

McLead struck Frazier with a bat a couple of times during the afternoon. Lewis struck Rodgers with a bat twice that afternoon. Smith struck LeBlanc and said, "Didn't I tell you not to bring . . . Frazier out here."

Eugene Burns (Red) and Anthony Durgin, who both worked for Frazier, entered the apartment. Smith asked them why they were helping Frazier instead of working for Smith. Eventually, Red and Durgin were allowed to leave.

Twice McLead told LeBlanc and Rodgers that they could work for Smith selling drugs but said that Frazier would die at sundown. Lewis told them the same thing.

At one point, McLead brought in some yellow rope, and Smith asked him where the handcuffs were. McLead replied he could not find them. Rodgers and LeBlanc were tied together with the yellow rope McLead had brought. Frazier's hands were tied with a lamp cord which McLead cut from a lamp in the apartment. When Smith led Frazier from the apartment, Frazier looked as if he had been injured and said to LeBlanc and Rodgers, "Tell them I just had fun." Lewis and McLead were there at the time. Smith led LeBlanc and Rodgers to a brown Buick and placed them in the backseat. Something covered with a blanket was in the backseat.

Lewis, who was wearing gloves, drove the Buick. Smith got in the front passenger seat. They drove off, but Smith said that he wanted to ride with "Derron." Lewis turned the car around, and Smith walked toward the apartments. LeBlanc saw Smith again in the passenger seat of a beige Toyota truck which was driven by McLead.

Lewis got out of the Buick, knocked on the trunk, and asked Frazier if he could breathe. LeBlanc heard Frazier's voice from the trunk say, "Yes."

The Buick followed the Toyota truck. LeBlanc remembered being on the 10 and 60 freeways and taking the 14th/San Timoteo exit. During the trip, Rodgers managed to free his hands. Lewis pointed a gun at them and said, "Go ahead so I can put a bullet in you right now." The truck pulled to the side of the road and the Buick followed. McLead, Smith and Lewis met in front of the Buick. Lewis said to Smith, "Please wait. They want to talk to you." Smith walked around the passenger side of the Buick and said, "I'm killing them all." Smith picked up an M-1 from the front floorboard of the Buick and walked back around the car. LeBlanc and Rodgers lay down in the backseat. LeBlanc heard gunshots, heard the trunk open and heard more gunshots, felt a thump against the back of the seat, and then felt his shoulder jerk. LeBlanc saw Smith get in the front passenger side of the car and heard the gun cocked. LeBlanc covered his face with his hands and was shot in the hand which spun him around. LeBlanc was then shot twice in the back of the head. LeBlanc heard Smith say, "He ain't dead yet," and then heard two more gunshots, and then heard clicks. Someone said, "Give me another gun." LeBlanc heard more clicks and heard Smith say, "Let's go. They're going to die anyway."

After hearing the truck leave, LeBlanc and Rodgers got out of the Buick. LeBlanc left to get help and managed to get a ride to an Alpha Beta store from Robert Schmidt. Schmidt testified it was after 7:00 p.m. when LeBlanc ran up to his car. The drive to

6

Alpha Beta was two to three miles, and Schmidt drove seventy-five to eighty miles per hour. At the Alpha Beta store, the police were called.

LeBlanc received a shoulder wound, two wounds to his head, and one to his hand. Frazier died from bullet wounds received in the shooting. Rodgers received bullet wounds to the left chest, the head, the wrist, and the abdomen.

Rodgers testified that he, Frazier and LeBlanc had made $ 2,000 selling drugs in Perris on December 31, 1985. Rodgers identified McLead as the person who initially entered the apartment with a gun. Rodgers recognized Smith and Pierre from the group that followed McLead into the apartment. Smith asked Frazier why he was in Perris and why he was "messing up for" Smith. McLead was in and out of the apartment on January 1, 1986. When Smith spoke to Rodgers in the bathroom, he asked Rodgers who knew Frazier, Rodgers, and LeBlanc were in Perris. Rodgers told Smith it would not be a good idea to kill them since everyone knew Smith "had Perris tied up" and that Perris was dealing with Smith. Smith replied, "Fuck it. I'll do some time." When McLead took Rodgers's radio he said, "It's mine now." When being transported to San Timoteo Canyon, Rodgers heard Frazier say from the trunk, "Where are we going?" Rodgers testified that Smith first aimed the M-1 at Rodgers from outside the car and shot Rodgers in the left side. Then Rodgers heard the trunk open and heard gunfire. After defendants left, LeBlanc went for help and Rodgers waited at the Buick until police arrived at around 7:34 or 7:38 p.m.

7

The police had received a call about the shootings a few minutes earlier. Police found a multicolored blanket along with a jammed M-1 rifle, a .22-caliber rifle, and a 12-gauge shotgun. [¶] . . . [¶]

Roy Thomas testified that Lewis, who was driving a Buick, picked up Thomas at 4:30 or 5:00 p.m. and took him to W.L.'s apartment. While there Thomas heard Smith say, "I'm going to kill 'em." Thomas stayed only five or ten minutes. When he left, he hid behind a fence. He saw Smith walk a man who was limping to the Buick and put the man in the trunk. Thomas then left but drove by the apartments later. Thomas thought he saw McLead in front of the apartments 10 to 20 minutes after Thomas left. Over an hour later, Lewis called Thomas and asked him to pick Lewis up at McLead's house. Thomas saw McLead, Smith, and Lewis standing by McLead's truck at McLead's house. [¶] . . . [¶]

Teri Robinson testified that she arrived at W.L.'s apartment between 5:30 and 6:00 p.m. on January 1, 1986. She saw W.L., Lewis, McLead, Pierre, Thomas, Smith, two men tied together on the floor, and a third man in the corner. Robinson began talking on the balcony with W.L. when Smith, McLead, and Lewis came out to the balcony. Smith showed her a wad of money and asked her if she wanted to go out to dinner. Robinson saw Thomas and Pierre carry a multicolored blanket covering a long-shaped object and put it in a tan car. Robinson left about 20 to 30 minutes after she arrived. When she returned around 7:10 to 7:15 p.m., all of the men were gone except W.L.

8

Nancy Flores, who was waiting in a car for Robinson, testified that they arrived at the apartment around 5:00 or 6:00 p.m. About five or ten minutes later, Lewis knocked on the car window. Flores saw a blanket being carried to a car by someone. She could not determine who was carrying the blanket. She denied telling police previously that Lewis was carrying the blanket. After his arrest, Lewis led police to a .25-caliber pistol which was fired in the car that night.

Smith and Lewis presented no defense evidence.

Lewis, along with his codefendants, was found guilty of first degree murder in count 1, attempted murder in counts 2 and 4, kidnapping as a lesser included offense in counts 3 and 5 (§ 207, subd. (a)), residential robbery in count 6, and conspiracy to commit first degree murder in counts 7, 8, and 9. The jury found true the special circumstance that the murder was committed for financial gain but not true the special circumstances that the murder was committed during a robbery and a burglary. It found that a principal was armed with a firearm in the commission of counts 2 through 6. (*Mclead, supra,* 225 Cal.App.3d at p. 909.) Lewis was sentenced to life without possibility of parole for count 1, with a consecutive term of 7 years for count 2, plus a 1 year enhancement for the principal being armed with a firearm, with the remaining counts stayed pursuant to section 654.

On February 25, 2019, defendant filed a petition for resentencing pursuant to section 1170.95, asserting he was not the actual killer, did not, with intent to kill, aid or abet the murder, and was not a major participant. On February 7, 2020, the petition was

9

denied for lack of a prima facie showing of entitlement to relief.  Defendant timely appealed.

## DISCUSSION

At his request, this court appointed counsel to represent defendant on appeal. Counsel has filed a brief under the authority of *Wende* and *Anders*, setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requesting that we undertake an independent review of the entire record.  We offered defendant an opportunity to file a personal supplemental brief, and he has done so.

A.      *Whether the Trial Court Properly Followed the Procedures Outlined in Section 1170.95.*

Defendant argues that the trial court failed to follow the mandated procedures of section 1170.95.  We disagree.

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) (Stats. 2018, ch. 1015) amended section 188 to eliminate liability for murder under the natural and probable consequences doctrine.  (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1092–1093.)  It also amended section 189, which defines the degrees of murder to address felony-murder liability.  (*People v. Gutierrez-Salazar* (2019) 38 Cal.App.5th 411, 417.) The legislation also added section 1170.95, which establishes a procedure for vacating murder convictions that were based upon the natural and probable consequences doctrine and resentencing those who were so convicted.  (Stats. 2018, ch. 1015, § 4; *People v.*

10

*Lewis* (2020) 43 Cal.App.5th 1128, 1134 [260 Cal.Rptr.3d. 153], review granted Mar. 18, 2020, S260598.)

Pursuant to section 1170.95, subdivision (c), the following procedure is followed by a trial court presented with a petition challenging the sentence: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

Here, the court appointed counsel, and the parties were given an opportunity to submit briefing on the issues. At the hearing, the trial court determined that defendant failed to make a prima facie showing that he is statutorily eligible for resentencing under section 1170.95. (See *People v. Verdugo* (2020) 44 Cal.App.5th 320, 330 [257 Cal.Rptr.3d. 510], review granted Mar. 18, 2020, S260493; *People v. Tarkington* (2020) 49 Cal.App.5th 892.)

The trial court followed the mandated procedures in considering the petition.

B.      *Whether the Trial Court Erred in Denying an Order to Show Cause.*

Defendant argues he was entitled to the issuance of an order to show cause and that the trial court abused its discretion in refusing to issue the order to show cause. We disagree.

Pursuant to section 1170.95, an order to show cause may be ordered when the defendant has made a prima facie showing he is entitled to relief. To be entitled to relief, a defendant must show that he could not currently be convicted of first degree murder following the amendments to sections 188 and 189. The amendment to section 189 limits first degree murder liability based on a felony murder theory to a person who: (1) was the actual killer; or (2) although not the actual killer, intended to kill and assisted the actual killer in the commission of first degree murder; or (3) was a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e).)

The amendments did not alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily "know and share the murderous intent of the actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see *People v. Chiu* (2014) 59 Cal.4th 155, 167 [a direct aider and abettor "acts with the mens rea required for first degree murder"].) One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law.

12

In determining if a defendant is entitled to relief, a trial court considering a section 1170.95 petition may consider the record of conviction. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055 [265 Cal.Rptr.3d. 571], review granted Sept. 23, 2020, S263939.) Here, defendant is ineligible for relief under section 1170.95 as a matter of law because he "was convicted on a ground that remains valid notwithstanding Senate Bill 1437's amendments to sections 188 and 189." (*People v. Verdugo, supra,* 44 Cal.App.5th at p. 330, review granted, S260493.) The record shows the jury at defendant's trial adopted a theory of murder liability that remains valid under section 188 as amended by Senate Bill 1437—the theory that defendant, with the intent to kill, directly aided and abetted the commission of first degree murder.

In this regard, at the hearing in the trial court, the prosecutor argued and the trial court agreed that the jury had to find defendant personally intended to kill the victim in order to make a true finding on the special circumstances finding. (CALJIC No. 8.81.1.) In addition, as we observed in our opinion on direct appeal, during the home invasion robbery, "Twice McLead told LeBlanc and Rodgers that they could work for Smith selling drugs, but said that Frazier would die at sundown. *Lewis told them the same thing.*" (*McLead, supra*, 225 Cal.App.3d at p. 911, italics added.)

The record of conviction, including our opinion on direct appeal, demonstrates defendant was a major participant in the home invasion, the kidnaping, and the shootings, and that he expressed an intent to kill. When McLead struck Frazier with a baseball bat, Lewis struck Rodgers with a bat twice that afternoon. Although defendant did not

13

personally shoot into the car where the victims were bound up, he was major participant who manifested the intent to kill, so his conviction was not grounded on the natural and probable consequences doctrine.

Defendant presented no evidence that he was convicted under the natural and probable consequences theory, and his conviction on the conspiracy counts supports a conclusion he had a specific intent to kill Frazier, which is inconsistent with a theory he was convicted under a natural and probable consequences theory.

Insofar as the record of conviction includes our opinion on direct appeal, we note our conclusion that all three defendants clearly acted with the intent to kill Frazier, and that there was substantial evidence that they had a concurrent intent to steal. (*McLead, supra*, 225 Cal.App.3d at p. 916.)

C.      *Whether Defendant Is Entitled to An Evidentiary Hearing to Relitigate the Validity of the True Finding on the Financial Gain Special Circumstances Finding.*

Defendant argues he is entitled to an evidentiary hearing at which he could present evidence that the true finding on the special circumstance allegation was the product of prosecutorial misconduct. We disagree.

First, we point out that defendant did not raise this point in his petition for relief under section 1170.95, so it is forfeited. (*People v. Verdugo, supra,* 44 Cal.App.5th at p. 333, fn. 11, review granted, S260493.) In the trial court, his reply to the People's response to his petition argued only that he had made a prima facie showing and that any factual disputes should be resolved at the evidentiary hearing. He also argued that he had

14

made a prima facie showing based on the fact that his jury was instructed on the theories of aiding and abetting a felony murder (CALJIC Nos. 3.01 [aiding and abetting], 8.34 [aiding and abetting a felony murder]).  He did not challenge the special circumstances allegation, nor could he:  if defendant seeks to collaterally attach the validity of the special circumstance finding, he must do so by way of a petition for writ of habeas corpus.  (*People v. Galvan* (2020) 52 Cal.App.5th 1134, 1142, citing *People v. Gomez* (2020) 52 Cal.App.5th 1,17.)

Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the "murder was intentional and carried out for financial gain."  Even if the defendant is "not the actual killer," if that defendant "with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree," he or she is also subject to this special circumstance.  (§ 190.2, subd. (c); *People v. Fayed* (2020) 9 Cal.5th 147, 201-202.)  The 1978 version of section 190.2, in effect at the time of defendant's crime, had the same requirements.  (*People v. Freeman* (1987) 193 Cal.App.3d 337, 339.)

We have recently held that defendants with undisturbed and final special circumstance findings are barred as a matter of law from petitioning for relief under section 1170.95.  (*People v. Jones* (2020) 56 Cal.App.5th 474 [270 Cal.Rptr.3d. 362], review granted January 27, 2021, S265854.)  Defendant has an undisturbed and final special circumstances finding, so he is barred from relief under section 1170.95.  The record of conviction establishes the jury found that Lewis, with the intent to kill, directly

15

aided and abetted the commission of first degree murder whether that murder was based on a theory of felony murder, or on a theory of deliberate and premeditated murder. Certainly, the record in this case, which includes defendant's repetition of McLead's statement that the murder victim would be killed, establishes he could be convicted of first degree murder even after the enactment of Senate Bill 1437.

If defendant wishes to challenge the validity of the special circumstances finding, whether pursuant to the holdings of *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522, or based upon an alleged *Brady* violation (ref. *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]), or some other ground of collateral attack, he must file a petition for writ of habeas corpus.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
                                                            P. J.


We concur:

McKINSTER _____
                                J.

SLOUGH _____
                                J.